**Charles E. COMPTON et al., Appellees,**

**v.**

**METAL PRODUCTS, INC., Appellant.**

**No. 15248.**

United States Court of Appeals, Fourth Circuit.

Argued May 13, 1971.

Decided Dec. 16, 1971.

5. It should be pointed out that in *Whiteley,* no attempt was made by the State

to justify the arrest as a warrantless arrest.

William G. Kratz, Jr., W. Mifflin, Pa. (Edward F. Welsh, and Parmelee, Utzler & Welsh, Pittsburgh, Pa., on brief), for appellant.

Thomas H. Murray, Pittsburgh, Pa. (Brown, Murray, Flick & Peckham, Pittsburgh, Pa., on brief), for appellees.

Before SOBELOFF, WINTER, and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is an appeal from a decision by the district court that United States Letters Patent No. 2,760,255, owned by appellee Charles E. Compton and exclusively licensed to appellee Polan Industries, Inc., is valid and infringed by appellant Metal Products, Inc. Metal Products also appeals from the district court's decision that the plaintiffs had not misused the patent monopoly granted to Compton under No. 2,760,255 and three other United States Patents, Nos. 2,594,-256, 2,784,955, and 2,719,708.[1] We think that the Patent No. 2,760,255 is invalid for obviousness, 35 U.S.C. § 103. In addition, we think that paragraph 15 of the license agreement between Compton and Joy Manufacturing Company is an unreasonable restraint of trade and constitutes a misuse of the patents by the plaintiffs and that the Joy-Polan agreement unlawfully extends the monopoly granted by the Compton patents, likewise constituting a misuse of the patents.

I

The Compton Patent No. 2,760,255 relates to a highly successful method of manufacturing screw conveyors used in certain types of coal mining operations.

When such a screw conveyor is fitted with a leading cutting edge, it forms an enormous drill-like device that can be bored horizontally into the sides of coal-laden hills. Working much like an oversize carpenter's brace and bit,[2] the cutting edge tears and breaks its way through coal deposits while the screw conveyor, rotating on a central shaft, passes the coal out to waiting receptacles.

The use of rotating helical surfaces predates modern civilization.[3] Today, helical devices are employed in a variety of uses—from drilling holes for telephone poles to conveying grain into storage silos. The use of screw conveyors for coal mining is more difficult to accomplish because of larger size, and the tremendous stress created by the passage of tons of coal along its central shaft.

One method used for constructing very large screw conveyors is to connect a series of discs with a central opening, and then stretch the connected discs along a central shaft as in Gredell, Patent 1,738,994 (see appendix, figure 3). Each disc is slit radially and successively connected by being welded to another disc at the slits. The generation of stress at the inner periphery of each disc when stretched out along the central shaft tends to distort the desired helical configuration. The Compton patent relates to an economical method to prevent the stress-generated distortion during the stretching process.

Compton solved the problem by severing the lines of inner periphery stress. He cut a series of yet smaller slits radially from the central opening of the discs (see appendix, figure 1). The only dis-

---

1. The Special Master found, "There being now no contention that any of the claims in United States Letters Patent Nos. 2,760,624; 2,616,677; 2,764,397; 2,719,-029 and 3,083,955 are infringed by the Defendant, Metal Products, Inc., no conclusion with respect to the validity or invalidity thereof needs to be drawn." Revised Report of the Special Master, at 16 (March 24, 1970), (Hereinafter cited as Revised Report). Therefore we do not consider any contentions relating to the

validity, infringement or misuse of these latter five patents.

2. One early screw conveyor manufactured by Compton mined holes five feet in diameter and 102 feet deep, producing up to 800 tons of coal per shaft.

3. History records that Leonardo da Vinci employed a screw mechanism in his design of an early flying machine. W. Durant, 5 The History of Civilization 219–21 (1953).

tinction between the Compton method and the method employed by appellant Metal Products is the use of the triangular slots, instead of the Compton slits, to relieve distortive stress (see appendix, figure 2). It is to be noted that the Compton "slits" become slots in appearance upon application (see appendix, figure 1).

We think the mere addition of slits (or slots) to relieve metal stress is obvious in light of the prior art. If cutting a disc once (Gredell) enables a metal worker to bend the disc into a helical configuration, it might occur to one skilled in the trade to cut it again further to facilitate bending. Hohlfeld (Figure 4) teaches multiple cuts in strip metal.

Section 103 of the Patent Act of 1952, 35 U.S.C. § 103, invalidates the patent.

§ 103. *Conditions for patentability; non-obvious subject matter.*

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title [anticipation], if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

"While the ultimate question of patent validity is one of law . . . the § 103 condition . . . lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

The Patent Office examiner recognized the obvious nature of cutting slits to relieve metal distortion stress when he rejected Compton's first application filed May 26, 1951. In his letter of December 16, 1952, he stated: "No invention is seen in merely providing slits radially disposed around the central hold of the Gredell discs (see appendix, figure 3) to facilitate bending or flexing. It is common to provide slits or slots in the metal working arts to facilitate bending as shown by Hanry, Sibley and Hohlfeld."[4] Among others, the examiner cited the Hohlfeld (German 1924) Patent (see appendix, figure 4) to illustrate the prior use of slits to relieve metal stress. In constructing a helical configuration like that of a screw conveyor, we find no distinction, as Compton and Polan suggest, between starting with discs, or using a ribbon of metal as in Hohlfeld. Given the prior art (*e. g.* Gredell and Hohlfeld), the cutting of slits in a disc to reduce stress in bending would, we think, be obvious to one skilled in the metal working arts. Whether one starts with a disc or a metal strip, the problem is the same: a particular piece of metal must be changed from one configuration (disc or strip) to another (helix) by distortive stress. If the change is to be successful, undesirable distortive side effects must be eliminated. Hohlfeld and the other prior art teaches the method used by Compton: relieving lines of stress by cutting the metal. Since the principle of cutting lines of stress was known to those skilled in the metal arts as early as 1924, the Compton result is rendered obvious despite the distinction that Compton

4. It is difficult to understand why the Patent Office relented from its initial position. The file wrapper reveals that Compton responded to the examiner's objections by urging that his method was not *anticipated* by the prior art. See 35 U.S.C. § 102. The language of § 103 clearly states that an invention may be obvious while still not anticipated, and courts have so interpreted the provision. *See, e. g.,* Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., 436 F.2d 1180, 1183 (7th Cir. 1971). Absence of anticipation may actually suggest obviousness.

chose to start with discs rather than strips of metal. "While it is true that patents have frequently been sustained where mechanical expedients were derived from non-analogous arts and so not obvious, this has not been true where what was borrowed was a common and generally known expedient in mechanical arts." Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., 332 F.2d 406, 413 (6th Cir. 1964), quoting Detachable Bit Co. v. Timken Roller Bearing Co., 133 F.2d 632, 637 (6th Cir. 1943).

The fact that the Hohlfeld triangular slots compress into slits when wound around a central shaft, and the Compton slits open to triangular slots when stretched along a central shaft, is a distinction without a difference in light of Section 103. See, Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536, 538-539 (2d Cir. 1966). Applying the principle to discs (instead of strips) may have required skill, but that does not necessarily support non-obviousness. Blumcraft v. Citizens and Southern National Bank, 407 F.2d 557, 559 (4th Cir. 1969). The end result is merely the combination of methods well known in the prior art. See, Anderson-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1952); Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321, 326 (2d Cir. 1968).

■ Compton and Polan urge upon us the striking financial success of the Compton method and the amount of experimentation required to finally devise the method. The financial success of the patented method is of only secondary importance under the standards of Section 103, Graham v. John Deere Co., *supra* 383 U.S. at 17–18, 86 S.Ct. 684, and is not a measure of obviousness. Blumcraft v. Citizens & Southern National Bank, *supra* 407 F.2d at 560.

Neither is the amount of time spent by Compton in devising the method a controlling factor. "[T]he ultimate question is whether a hypothetical person having ordinary skill in the art would have readily found the same solution when addressing himself to the same problem". Gass v. Montgomery Ward & Co., 387 F.2d 129, 130 (7th Cir. 1967). *See also,* University of Illinois Foundation v. Winegard Co., 402 F.2d 125, 127 (8th Cir. 1968). We resolve that question against Compton and Polan and reverse the decision of the district court sustaining the validity of the patent.

II

The district court found that three other United States Patents Nos. 2,594,-256, 2,784,955 and 2,719,708, which were issued to Compton, were valid and infringed by Metal Products, enjoined any further infringement[5] and ordered an accounting for damages for past infringement. No appeal is taken from the findings of validity and infringement. However, Metal Products contends that despite validity and infringement the court should have refused to enforce Compton's rights under the patents because Compton had misused its monopoly. The Special Master found no misuse, and the district court affirmed this conclusion. We reverse.

■ It is well settled that the monopoly granted to the patentee is a limited one, and that, "[T]he use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant," is forbidden. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1941). It is also clear that when a patentee has used his patent in a manner contrary to public policy, a court may decline to enforce his rights as against an infringer until such misuse has abated. Morton Salt Co. v. G. S.

5. This injunction did not apply to No. 2,594,256, which had expired.

Suppiger Co., *supra*.[6] Metal Products points to three provisions in the 1960 license agreement between Compton and Joy Manufacturing Company which it claims constitute a misuse of the patent monopoly.

 The first claim is that paragraph 18 [7A] extends the patent monopoly beyond its legal time limit, thereby constituting a misuse, Brulotte v. Thys Co., *supra* n. 6. We think a reading of the agreement as a whole supports the conclusion of the Special Master to the contrary. Since Sections a, b and c of paragraph 4 [7B] specifically refer to royalties to be paid at different dates (although the copy introduced into evidence leaves the amounts blank) and since the expiration of a specific patent seems to mark some change in royalty rates, the more logical reading of the contract as a whole is that, "Paragraph 18 provides for the granting of a plur-

ality of licenses, one under each of the patents. Furthermore, when any one of the patents expires, the license under that patent automatically expires." Revised Report at 7. The defendant's second contention is that paragraph 3 [8] of the Joy-Compton agreement constitutes a misuse in two respects: it purports to grant an exclusive license throughout the world when Compton did not own patents throughout the world and it seeks to grant a license with respect to unpatented "parts and subassemblies" of licensed machines. With regard to these contentions the Special Master found,

[P]aragraph 4 of the agreement provides that royalties shall be payable only on "licensed machines" and in Paragraph 2 of the agreement the term "licensed machines" is defined as a machine embodying any or all of the inventions "disclosed and claimed" in any of the licensed patents. The clear meaning of this seems to be that royal-

---

6. *Accord* B.B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1941), Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), Brulotte v. Thys Co., 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed. 2d 99 (1964). *See generally*, J.P. Anderegg, Misuse of Patents in The Encyclopedia of Patent Practice and Invention Management at 587.

7A. Paragraph 18 reads as follows:
 Unless sooner cancelled as otherwise provided herein, the licenses granted hereunder shall continue until the expiration or abandonment of the last to expire or to be abandoned of the issued patents and pending patent applications from time to time constituting the Licensed Patents, whichever event occurs later, and shall then terminate.

7B. Sections a, b and c of paragraph 4 read in part as follows:
 Joy shall pay royalties to Compton as follows,

 . . . . .

 (a) For the period of 5 years from the effective date hereof through July 31, 1965, an earned royalty of of the net selling price, as defined below, on each Licensed Machine which is sold during said period. . . .
 (b) For the period of 3 years from August 1, 1965 through July 31, 1968, being the expiration of said patent No.

2,562,841, an earned royalty of of the net selling price, as defined below, on each Licensed Machine which is sold during said period. . . .
 (c) For the period beginning August 1, 1968 through the remaining life of the license granted under paragraph 3 of this agreement, an earned royalty of of the net selling price, as defined below, on each Licensed Machine which is sold during said period and which embodies any invention covered by a granted claim in any unexpired patent or an allowed claim in any pending application of the Licensed Patents.

8. Paragraph 3 reads in part:
 Compton hereby grants to Joy under the Licensed Patents, and upon the terms and conditions herein stated, an exclusive license . . . with the right to grant sublicenses, to make and have made, lease, use and sell throughout the world, Licensed Machines and parts and a subassemblies of such machines.
 Paragraph 2(a) defines "Licensed Machine" as, "[A] machine embodying any or all of the inventions disclosed and claimed in any of the 'Licensed Patents' . . . " and the "Licensed Patents" were the patents under which the licenses were given.

ties are payable, only on those parts and subassemblies which are covered by the claims of a patent. As regards the expression "throughout the world," this again must be modified by Paragraph 4 of the agreement which provides that royalties shall be payable only on "licensed machines". It is believed that in the absence of a French patent, for example, no royalties would be payable under that agreement as a result of machines manufactured, used or sold in France. Thus, the term "throughout the world" seems to mean that the license is granted only in those countries where patent protection has been obtained. Revised Report, at 7–8.

Although paragraph 3 of the agreement is ambiguous, it is clarified by paragraphs 2 and 4, and we think the conclusion of the Special Master, adopted by the district court, is not erroneous. Since the payment of royalties is limited to patented items where patent protection exists, paragraph 3 creates no unlawful extension of the patent monopoly.

Paragraph 15 of the license agreement states:

> During any period for which he is entitled to royalties hereunder Compton shall not without Joy's prior consent engage in any business or activity relating to the manufacture or sale of equipment of the type licensed hereunder, or have any affiliation financial or otherwise with, or give any advice, counsel or assistance to, any other person, firm, company, or entity directly or indirectly engaged in the manufacture or sale of such equipment.

Metal Products claims that by requiring Compton not to engage in any activity relating to the manufacture or sale of equipment of the type licensed, the plaintiffs have misused the patent monopoly. We agree.

The plaintiff contends that this paragraph restricts Compton from competing only with respect to the licensed devices, which he was precluded from doing any-way since he granted an exclusive license. We cannot agree that paragraph 15 is so restrictive. Whether or not "equipment of the type licensed" refers to mining equipment in general or just to augers, the use of the word "type" indicates clearly that more than a restriction upon the specific machines embodying the licensed patents was contemplated. In addition, this restriction is for as long as royalties were to be paid, which is until the last patent expires, or 1980. Other patents expire before then and one has already expired. Yet Compton has agreed not to compete for 20 years even with respect to his patents which have expired and entered the public domain. Furthermore, there is no restriction as to territory in which Compton is not to compete.

■■■ No citation is necessary for the proposition that such an agreement, standing alone, would violate the common law prohibition against agreements in restraint of trade as well as Section 1 of the Sherman Act, 15 U.S.C. § 1, were it not for the limited exception carved out by the patent laws. However, a patentee is not allowed to extend the monopoly granted him beyond the exclusive right to make, use, and vend the device described in the patent for the term of the patent. Morton Salt Co. v. G. S. Suppiger Co., *supra*, Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940). Here, the agreement that Compton was not to compete with respect to the type of equipment licensed meant that Compton also agreed not to compete with regard to equipment which may not have embodied any of his patents. In addition, by agreeing not to compete so long as royalties were due, Compton, in fact, agreed not to compete with regard to equipment embodying expired patents. In both of the above aspects, the agreement falls outside the limited monopoly granted by the patent laws, because in exclusively licensing his patents, the patentee himself could neither require non-competition beyond the term of the patents nor as

to items not covered by the patents. Transparent Wrap Machine Corp. v. Stokes and Smith Co., 329 U.S. 637, 644, 67 S.Ct. 610, 91 L.Ed. 563 (1947). We think that by agreeing to restrictions on his own competition which he could not compel of others, the patentee has extended the monopoly granted by the patent laws beyond its legal bounds, and that this extension constitutes a misuse of the patent. We agree with the statement of the court in McCullough v. Kammerer Corp., 166 F.2d 759, 762 (9th Cir. 1948), that "The public, in a system of free competition, is entitled to have the competition of other devices with a patented device and here it is against that public's interest to use the patent to suppress such competition."

 The Special Master, however, felt that the Joy-Compton agreement was part of the sale of a going business, and that paragraph 15 did not constitute a misuse of the patents because it was a valid covenant not to compete. He stated, "[A] contract or covenant not to engage in a particular trade or business is legal and enforceable in connection with the sale of a going business." Revised Report, at 8. We do not think the record supports this view of the agreement, especially since the parties themselves apparently viewed it as a license, not as a contract for the sale of a business.[9] However, assuming that the standard by which this covenant is to be judged is that of covenants not to compete ancillary to the sale of a business, we think that this paragraph is an unreasonable restraint of trade. It is true that, in general, covenants not to compete which are reasonable with regard to time and space and are reasonably necessary to protect the purchaser's investment are valid, but it is equally true as a general proposition that covenants not to compete which are unlimited as to space or time are invalid and unenforceable. The Oregon Steam Navigation Co. v. Winsor, 87 U.S. (20 Wall.) 64, 22 L. Ed. 315 (1873). We think that even if paragraph 15 were clearly a covenant not to compete ancillary to the sale of a going business, which it does not appear to be,[10] it would be an unreasonable restraint of trade. The need of Joy to protect its investment does not outweigh the public's right under our system to expect competition and the benefits which flow therefrom, and the total withdrawal of Compton from the mining machine manufacturing business, or even from the auger manufacturing business, everywhere in the world for a period of 20 years unreasonably lessens the competition which the public has a right to expect, and constitutes misuse of the patents.

### III

Joy has purported to sell its rights under the United States patents licensed to it by Compton to plaintiff Polan Industries.[11] While we think that any misuse

---

9. The agreement is termed a "License Agreement" and states, "[C]ompton desires to grant and Joy desires to acquire a license under each and all of the United States and Foreign patents. . . ." In addition, paragraph 3, *supra* n. 8, states that Compton grants Joy an exclusive license.

10. See n. 9, *supra*.

11. The relevant portions of the Joy-Polan agreement are:
1. Joy hereby sells, transfers and assigns to Polan its entire Auger business consisting of the following property and all rights appertaining thereto, and Polan hereby purchases the same:

\* \* \* \* \*

D. The exclusive right to make, use, sell, lease, service, repair and rebuild Augers throughout the world incorporating therein all of the inventions described and claimed in any and all of the United States patents listed in Schedule B attached hereto; subject, however, to the nonexclusive rights heretofore granted by Charles E. Compton to Salem Tool Company under United States Patents Nos. 2,719,708 and 2,764,397. The exclusive right herein granted to Polan shall be for the full remaining term of each of the patents listed on Schedule B.
2. For the purpose of this agreement the term "Auger" shall mean an auger

of the patents created by the royalty provisions of this agreement has been cured by the subsequent agreement whereby Polan agreed to pay Joy a lump sum payable in four years, we think that the Joy-Polan agreement still suffers from defects constituting a misuse.

By this agreement, continuing until 1985, Joy has attempted to grant to Polan exclusive rights as to augers of the general type formerly manufactured by Compton. This would include augers not covered by patents and augers whose patents had been expired for five years. The patent law does not give Joy this power, Mercoid Corp. vs. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 689, 64 S.Ct. 278, 88 L.Ed. 396 (1944), and we think that any attempt to control unpatented augers would run afoul of the antitrust laws. Likewise, the patent law does not give Joy the power to grant exclusive rights to repair and rebuild even patented augers, ARO Mfg. Co. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961).

The Special Master found that, "While the patents in suit were part of the assets sold by Joy to Polan, no royalties are payable on the patents as such and, consequently, the agreement does not constitute a patent license agreement but rather a sales agreement and an assignment of all rights under certain patents, tantamount to an assignment of the patents themselves. Being an assignment of patent rights rather than a license, the rules applicable to misuse as applied to license agreements do not apply." Revised Report, at 9. We disagree. Although we think that the fact that 10 percent of the net selling price of each auger sold by Polan was payable to Joy during the life of the agreement makes it abundantly clear that the parties intended the patents to be licensed, it is true that finally a lump sum was agreed upon. This makes no difference, for even if this agreement is termed an assignment of rights under the patents instead of an exclusive sublicense (if there is a difference in this fact context) Joy could not assign more than it had. It did not have the power to assign to Polan the exclusive right to build augers not covered by the patents, to repair and rebuild augers even covered by the patents, and to do both until 1985, five years after all patents had expired. Therefore, these sections of the Joy-Polan agreement constituted a misuse of the Compton patents.

Because of the misuse of Compton patents in the Joy-Compton and Joy-Polan agreements, we reverse the district court's decision to enforce the plaintiffs' rights under the Patents Nos. 2,594,256, 2,784,955, and 2,719,708. Plaintiffs are entitled to no accounting for past damages. The district court will withhold its injunction until misuse has abated.

Reversed.

machine, including repair and replacement parts therefor, of that general type formerly manufactured and sold by Compton, Inc., of Clarksburg, West Virginia.

APPENDIX

Figure 1. - Compton Patent 2,760,255

[A4553]

Figure 2. - Metal Products Device

[A4554]

Figure 3. - Credell Patent 1,738,994

(Prior art)

[A4555]

453 F.2d—4

Figure 4. - Hohlfeld (Cerman) Patent

(Prior art)