In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2039

BAXTER INTERNATIONAL, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

ABBOTT LABORATORIES,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 01 C 4809 & 01 C 4839—**Ronald A. Guzmán**, *Judge.*

ARGUED OCTOBER 29, 2002—DECIDED JANUARY 16, 2003

Before CUDAHY, COFFEY, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Baxter International invented sevoflurane in the 1960s. This substance, a gas at room temperature, has good anesthetic properties. But it was too difficult and costly to produce commercially until the early 1980s, when Baxter devised an efficient process for its manufacture. Baxter obtained two process patents, the latter of which expires in December 2005. But the anesthetic gas still could not be sold in the United States unless it first received the FDA's approval, and Baxter was not willing to bear the costs of the required medical testing.

So in 1988 it granted to Maruishi Pharmaceutical Company, of Japan, an exclusive worldwide license to practice the sevoflurane process patents Baxter owned or was pursuing. Maruishi obtained approval to sell the anesthetic in Japan, where it was a great success, as it has become in other nations since. This suggested that it would be worth obtaining the FDA's approval to sell in the United States. Abbott Laboratories took a sublicense from Maruishi in 1992, obtained the FDA's approval after spending approximately $60 million on testing, and in 1995 began selling sevoflurane in the United States. Maruishi remains the sole manufacturer under the Baxter patents; Abbott resells sevoflurane that it purchases from Maruishi, which pays Baxter a royalty based on its total sales. Today sevoflurane is the best-selling gas used for anesthesia in the United States, with approximately 58% of sales. Desflurane holds 35% of this market, and isoflurane accounts for almost all of the remaining sales. Isoflurane is not protected by any patent and sells for less, but it is slower in both onset and recovery and has an irritating taste and smell. Desflurane likewise has an annoying smell and aftertaste, though its properties otherwise are comparable to sevoflurane—which therefore has become the anesthetic of choice and commands a premium price.

Sevoflurane's success gave rivals an incentive to invent around Baxter's process patents. Ohio Medical Associates (now known as Ohmeda) set out in 1997 to do just this. In 1999 Ohmeda obtained a patent for a new way of making sevoflurane, distinct from Baxter's process but equivalently cheap and effective. It planned to introduce a rival sevoflurane anesthetic, which it could do by filing a "me too" application with the FDA. Ohmeda could receive approval without costly tests just by showing that the finished product is identical to Abbott's.

Before Ohmeda could bring sevoflurane to market, it was acquired (in 1998) by Baxter—which decided to proceed

with Ohmeda's plans and compete with the sevoflurane made by Maruishi and sold in the United States by Abbott. Baxter concluded that it would make more from selling Ohmeda-process sevoflurane than it would lose in reduced royalties from Maruishi for Baxter-process sevoflurane. Abbott, which contends that it has spent more than $1 billion to commercialize sevoflurane (including distribution of equipment for administering the drug and marketing to alert anesthesiologists to its benefits) did not welcome competition before the expiration of the Baxter patents. Abbott initiated arbitration under the Baxter-Maruishi agreement (to which it had become a party in 1992) and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, [1970] 21 U.S.T. 2517, T.I.A.S. No. 6997, implemented by 9 U.S.C. §§ 201-08. The agreement specifies a multi-national tribunal, which consisted of a U.S. attorney, a Spanish attorney, and a Japanese law professor.

Abbott contended that Baxter's sale of Ohmeda-process sevoflurane before the Baxter patents expired would violate the exclusivity term of the license; Baxter replied, first, that the license does not explicitly forbid Baxter itself from competing with Maruishi (in other words, that exclusivity means only that Baxter can not issue any other licenses), and, second, that if the license does forbid Baxter from competing, then it violates U.S. antitrust law, particularly §1 of the Sherman Act, 15 U.S.C. §1, and is unenforceable. The arbitrators ruled against Baxter on both issues. The tribunal held that the license is exclusive in the strong sense and that any reduction in competition is attributable to Baxter's decision to purchase the competing Ohmeda process while bound by this promise not to compete with its licensee. On cross suits filed by Abbott and Baxter, the district judge then directed Baxter to comply with the award, rejecting its contention that the license, as construed by the tribunal, violates the Sherman Act or the public policy of the United States. The judge observed that competition

from desflurane, isoflurane, and sevoflurane made by any other process (for the sevoflurane molecule is unpatented) is unaffected. 2002 U.S. Dist. LEXIS 5475 (N.D. Ill. Mar. 26, 2002).

Baxter argues at length in this court that the Baxter-Maruishi license, construed to keep Ohmeda-process sevoflurane off the U.S. market until 2006, is a territorial allocation unlawful *per se* under §1 of the Sherman Act. But the initial question is whether Baxter is entitled to reargue an issue that was resolved by the arbitral tribunal. We think not; a mistake of law is not a ground on which to set aside an award. See *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577 (7th Cir. 2001). Section 207 says that "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." Legal errors are not among the grounds that the Convention gives for refusing to enforce international awards. Under domestic law, as well as under the Convention, arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 149 (1968). "Courts thus do not sit to hear claims of factual or legal error by an arbitrator". *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

Arbitrators regularly handle claims under federal statutes. See, e.g., *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) (claims under the Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (claims under the Securities Exchange Act of 1934 and the Racketeer Influenced and Corrupt Organizations Act); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) (international arbitration of claims under the Securities Exchange Act of 1934). We do not see any reason why things should be otherwise for antitrust issues—nor, more importantly, does the Supreme Court,

which held in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), that international arbitration of antitrust disputes is appropriate.

*Mitsubishi* did not contemplate that, once arbitration was over, the federal courts would throw the result in the waste basket and litigate the antitrust issues anew. That would just be another way of saying that antitrust matters are not arbitrable. Yet this is Baxter's position. It wants us to disregard the panel's award and make our own decision. The Supreme Court's approach in *Mitsubishi* was different. It observed (473 U.S. at 639 n.21):

> The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own. Doubtless, Congress may specify categories of claims it wishes to reserve for decision by our own courts without contravening this Nation's obligations under the Convention. But we decline to subvert the spirit of the United States' accession to the Convention by recognizing subject-matter exceptions where Congress has not expressly directed the courts to do so.

Starting from scratch in court, as Baxter proposes, would subvert the promises the United States made by acceding to the Convention.

According to Baxter, there is a difference between arbitrating an antitrust issue (the subject of *Mitsubishi*) and *creating* one—which it accuses these arbitrators of doing. If the tribunal had construed the Baxter-Maruishi agreement differently, there would have been no antitrust problem. Baxter relies on the observation in *George Watts* that arbitrators are not allowed to command the parties to violate rules of positive law. That's true enough, but *whether* the tribunal's construction of the Baxter-Maruishi agreement

has that effect was a question put to, and resolved by, the arbitrators. They answered no, and as between Baxter and Abbott their answer is conclusive. This is a point anticipated in *Mitsubishi*, which observed (*id*. at 638): "While the efficacy of the arbitral process requires that substantive review at the award-enforcement stage remain minimal, it would not require intrusive inquiry to ascertain that the tribunal took cognizance of the antitrust claims and actually decided them." The arbitral tribunal in this case "took cognizance of the antitrust claims and actually decided them." Ensuring this is as far as our review legitimately goes.

Treating Baxter as bound (*vis-à-vis* Abbott) by the tribunal's conclusion that the license (as construed to provide strong exclusivity) is lawful does not condemn the public to tolerate a monopoly. If the three-corner arrangement among Baxter, Maruishi, and Abbott really does offend the Sherman Act, then the United States, the FTC, or any purchaser of sevoflurane is free to sue and obtain relief. None of them would be bound by the award. As far as we can see, however, only Baxter is distressed by the award— and Baxter, as a producer, is a poor champion of consumers. See *Atlantic Richfield Co. v. USA Petroleum Co*., 495 U.S. 328 (1990); *Cargill, Inc. v. Monfort of Colorado, Inc*., 479 U.S. 104 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477 (1977).

What relief the Antitrust Division, the FTC, or a consumer would obtain, if there is an antitrust problem, is an interesting question. Baxter thinks that the solution should be an order allowing it to sell Ohmeda-process sevoflurane. It wants to take its acquisition of Ohmeda as given and ask what consequences it has for exclusivity under the Baxter-Maruishi agreement. Yet this is anachronistic. The Baxter-Maruishi agreement came first, and its exclusivity rule was a lawful ancillary agreement designed to induce Maruishi and its sublicensees to make the investments needed to

bring the new drug to market. See generally *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir. 1985); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) (Bork, J.). At the time Baxter acquired Ohmeda it was obliged by contract to refrain from producing sevoflurane until 2006. (This is how the tribunal understood the Baxter-Maruishi agreement, and a court must accept this interpretation.) So if there is an antitrust problem, it lies in the acquisition—and the remedy would be divestiture of the Ohmeda process patent. Baxter can achieve that outcome on its own. Baxter, which can solve unilaterally any antitrust problem, is in no position to insist that the burden of solution fall on Abbott by depriving it of the benefit of the exclusive Baxter-Maruishi license. Why should a decision Baxter made in 1998 reduce the rights Abbott enjoys under a promise Baxter made to Maruishi in 1988? But it is unnecessary to pursue this line of argument. All that matters today is that the arbitrators have concluded that the antitrust laws (and Baxter's related arguments, which we need not address) do not diminish Abbott's contractual rights—and that decision is conclusive between these parties.

AFFIRMED

CUDAHY, *Circuit Judge,* dissenting. To understand fully why the majority's enforcement of this dubious arbitration award is misguided, a brief synopsis of the background material not fully described by the majority is essential. In 1983 and in 1988 Baxter gave options to Maruishi to license patents covering the one-step process of manufacturing sevoflurane. By 1992, when negotiations with Abbott

concerning the introduction of sevoflurane in the United States were undertaken, Baxter's product and method-of-use patents for sevoflurane had expired. Arbitration Transcript at 675-83 ("Arb. Tr."). Hence, the only patents that Baxter could license to Maruishi and that Maruishi could in turn sublicense to Abbott were those covering the one-step manufacturing *process*, which were still in effect. In its negotiations with Baxter, Maruishi considered attempting to obtain a covenant not to compete not only with respect to the one-step process but also as to sevoflurane itself, but instead turned its attention elsewhere. Maruishi concluded that the exclusive license for the one-step process and related intellectual property was "sufficient protection." *See* Arb. Tr. at 523-24. The 1992 negotiations with Abbott dealt only with the one-step process. Arb. Tr. at 386-91.

In 1992, when sublicensing to Abbott was negotiated, two distinct sets of agreements were involved in the negotiations. First, there were the Sevoflurane Agreements establishing the terms of the licenses, and granting exclusive rights to Maruishi and to Abbott to manufacture sevoflurane under the one-step patent, to all improvements on the one-step patents and to all technology and confidential proprietary information ("know-how") acquired during the development of the one-step process. Next, all the parties entered into a Dispute Resolution Agreement (DRA), first, to ensure that in the event of a dispute commercialization of sevoflurane would go forward and, second, to provide a mechanism (arbitration) for resolving disputes arising from the Sevoflurane Agreements that would arguably impair what the parties referred to as the "Original Commercial Relationship" (OCR). The arbitrators were instructed by the DRA to attempt to maintain this Original Commercial Relationship—an "unusual" concept. Appellant's Br. at 9.

By the late 1990s, Ohmeda had developed and pa-
tented a different, *three-step* process to make sevoflurane
suitable to be marketed as a generic drug. Subsequently,
Baxter acquired Ohmeda. Faced with the threat of generic
competition—always anticipated, but now apparently to
be undertaken by Baxter—Abbott sought arbitration. The
arbitration panel conceded that the Baxter-Maruishi *li-
censing* agreement would not preclude Baxter's offering
generic competition because this licensing agreement cov-
ered only the one-step manufacturing process, which bore
no relation to the three-step process. But a two-member
majority of the panel found that, under the Dispute Res-
olution Agreement invoking the Original Commercial Re-
lationship, Baxter's proposed sales of generic sevoflurane
could be enjoined because they would reduce Abbott's
revenues below monopoly levels, even though the expecta-
tion of generic competition was nothing new. The third
member of the arbitral panel (the only American) dis-
sented since he concluded that the arbitrators were not
authorized to act independent of the licensing agree-
ment itself. The majority also found a breach of an Illinois
state duty of good faith, which the dissenting arbitrator
thought specious.

The majority upholds the arbitration award here by
declaring that, once the arbitrators have spoken to the
antitrust issues and in effect commanded the parties to
violate the Sherman Act, the courts have no business
intervening. Of course, the doctrine that requires extreme
deference by the courts to arbitration awards is based
on the theory that the parties to a contract may cede
broad, almost unlimited, power to an arbitration panel to
interpret their agreement. *See First Options of Chicago,
Inc. v. Kaplan*, 514 U.S. 938 (1995); *see also IDS Life Ins.
Co. v. Royal Alliance Assoc., Inc.*, 266 F.3d 645, 649
(7th Cir. 2001) ("Within exceedingly broad limits, the
parties to an arbitration agreement choose their method

of dispute resolution and are bound by it however bad their choice appears to be either ex ante or ex post."). In fact, the arbitrators function almost as agents of the parties to extend their deal to cover unforeseen circumstances. *See E. Associated Coal Corp. v. United Mine Workers of America*, 531 U.S. 57, 62 (2000) (telling courts to "treat the arbitrator's award as if it represented an agreement between [the parties] as to the proper meaning of the contract's words."); *EEOC v. Indiana Bell Tel. Co.*, 256 F.3d 516, 522 (7th Cir. 2001) ("The arbitrator acts on their (joint) behalf, with whatever authority the contract bestows. The resulting award is effectively the parties' joint decision."). All this rests on the proposition that the parties are free to adjust rights and liabilities *among themselves* as they see fit and through the instrumentality of arbitration to follow wherever the situation may demand. In this bilateral context a commitment to deference cannot be questioned.

But other considerations enter the mix when the issue becomes a matter of the arbitrators', in interpreting a statute, commanding the parties to break the law or to violate clearly established norms of public policy.[1] In the case before us, the arbitrators have instructed Abbott and Baxter (by imposing on Baxter a broad covenant not to compete with respect to sales of sevoflurane itself) to

---

[1] As the majority notes, the present case is governed by the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6996, implemented by 9 U.S.C. §§ 201 *et seq*. ("Convention"). 9 U.S.C. § 207 commands a court to enforce an arbitration award under the Convention unless one of the grounds for refusal to enforce found in the Convention is present. Article V(2)(b) of the Convention allows a court to refuse to enforce an arbitration award when "recognition or enforcement of the award would be contrary to the public policy of that country."

effect a horizontal allocation of markets, a clear violation of the Sherman Act. Under the arbitral decision, Abbott is granted a monopoly[2] in the sale of sevoflurane in the United States.

For some considerable time not long in the past, the law of the land was that antitrust disputes were not arbitrable. *See Am. Safety Equip. Corp. v. J. P. Maguire & Co.*, 391 F.2d 821 (2d Cir. 1968); *Applied Digital Tech., Inc. v. Continental Cas. Co.*, 576 F.2d 116 (7th Cir. 1978). Claims made under the Sherman Act were not merely private claims, but were quasi-public claims designed to protect the rights of consumers and the public at large. *Applied Digital Tech.*, 576 F.2d at 117. Since more than merely the rights of the parties were at issue, the agreement of the parties to arbitrate could not supersede the public's presumed interest in a judicial resolution of antitrust claims.

The growing fondness for arbitration, however, eventually eliminated the prohibition on submitting antitrust matters to arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), did not purport to directly overturn the doctrine that domestic antitrust claims could not be arbitrated, but subsequently, the Supreme Court in dicta and most of the Courts of Appeal considering the issue have interpreted *Mitsubishi* as placing antitrust and other statutory claims within the ambit of arbitration. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) ("The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities

---

[2] There is no dispute that Baxter's Ohmeda is the only generic competitor in the sevoflurane market for the foreseeable future, nor is there a dispute that the arbitral decision's prohibition on the sale of generic sevoflurane by Baxter preserves monopoly prices and levels of output of Abbott's sevoflurane product.

Act of 1933 all are designed to advance important pub-
lic policies, but, as noted above, claims under those stat-
utes are appropriate for arbitration."); *Seacoast Motors
of Salisbury, Inc. v. DaimlerChrysler Motors Corp.*, 271
F.3d 6 (1st Cir. 2001); *Kotam Elecs., Inc. v. JBL Consumer
Prods., Inc.*, 93 F.3d 724 (11th Cir. 1996); *Sanjuan v.
Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247 (7th
Cir. 1994); *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437 (9th
Cir. 1994); *Swensen's Ice Cream Co. v. Corsair Corp.*, 942
F.2d 1307 (8th Cir. 1991).

The present case is a good example of the extent to
which arbitration has come to pervade the legal culture.
First, the parties here constructed an elaborate, pre-dispute
arbitration agreement that not only served to regulate
the licensing agreement itself, but also, in an extraordi-
nary spasm of creativity during the arbitration, generated
a new and seemingly boundless cause of action, entirely
separate from the license itself, under which the par-
ties could presumably proceed. Then, during the arbitral
process, Baxter submitted to the arbitrators the supple-
mental argument[3] that, if the arbitrators pursued what

---

[3] It is an important distinction that this rather meta-juridical
antitrust claim "decided" by the arbitrators was not a simple
claim by Baxter against Abbott, but rather a request by Baxter
that the arbitrators step back and consider the larger implica-
tions of their underlying decision. This distinction becomes clear
when one recognizes that this issue could simply have been
ignored by the arbitrators and considered for the first time in
the district court—the arbitrators' interpretation of the license
and the DRA did not involve antitrust issues. But, if Baxter
had not raised the antitrust issue during arbitration, it would
have risked being met with a defense of waiver to considera-
tion of the issue here. Yet, on the other hand, Baxter's position
here might well have been strengthened if it had chosen not
to bring the question forward during arbitration and thereby

(continued...)

eventually did become their line of decision, they would be commanding unlawful conduct under the Sherman Act. And finally, neither Baxter nor Abbott contend that arbitration was inappropriate for resolution of the antitrust claim.

Now, the majority has taken the process one giant step further and has found that *Mitsubishi* not only allows submission of statutory and antitrust claims to arbitration, but denies our prerogative to refuse to enforce awards that command unlawful conduct.[4] The deciding circumstance, according to the majority, is that the question was put to, and decided by, the arbitrators themselves. Maj. Op. at 5-6 ("That's true enough, [that arbitrators are not allowed to command unlawful conduct,] but *whether* the construction of the Baxter-Maruishi agreement has that effect was a question put to, and resolved by, the arbitrators. . . . [A]s between Baxter and Abbott, their answer is conclusive."). Therefore, under the majority's analysis, the rule that unlawful conduct cannot be commanded by arbitrators is consumed by the exception that, if the arbitrators themselves say that what they have commanded is not unlawful, then "their answer is conclusive."

---

[3] (...continued)
armed Abbott with the (dispositive, as it turns out) argument for deference to the arbitration award.

[4] The Convention itself provides grounds for refusing to confirm an award under "public policy" principles. This circuit has recognized grounds (under the Federal Arbitration Act) for refusing to confirm if an arbitration panel acts in manifest disregard of the law, or, as otherwise viewed, if the arbitrators' decision commands a party to act unlawfully. *George Watts & Son, Inc. v. Tiffany & Co.*, 248 F.3d 577 (7th Cir. 2001). Rather than repeatedly referring to the applicable tests, I will simply refer to "unlawful conduct."

This cannot be correct. While *Mitsubishi* and its progeny make clear that the choice of the arbitral forum is to be respected, they do not confer on the arbitrators a prerogative to preemptively review their own decisions and receive deference on that review in subsequent judicial evaluations.[5] The majority is way off-base when it says that Baxter seeks merely to have us disregard the panel's decision and "throw the result in the waste basket." Maj. Op. at 5. Instead, we are performing exactly the traditional function of judicial review properly assigned only to us.

Therefore, I do not think we can simply note the arbitration panel's resolution of the antitrust issue and consider our work done. Instead, we must fulfill our judicial responsibilities and examine the effect of the outcome commanded by the arbitral award.[6] This means that we have to determine whether, going forward, the horizontal restraint on Baxter's competing with Abbott in the sevoflurane market violates the Sherman Act.

---

[5] It is clear that the arbitrators were doing exactly that—reviewing their own decision—and not deciding issues of law necessary to interpret the various agreements. The panel's "decision" on the antitrust issues is that "[i]t considers that no illegality results from the interpretation of the Sevoflurane Agreements in this Award." Supp. App. at 18-19.

[6] My analysis takes place in the context that the meaning of the Sevoflurane Agreements, as interpreted by the arbitrators, is not contested by Baxter. Therefore, although the arbitrators' findings seem a bit far-fetched to me, I take as a given that the DRA contains a broad, if implied, covenant not to compete that prohibits Baxter from competing with Abbott in any way in the sevoflurane market. This, of course, does not respond to the issue of lawfulness, which is the subject of my substantive analysis.

Sometimes, of course, a horizontal restraint is a necessary part of an endeavor that, in the whole, benefits consumers. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 101 (1984). That is the claim here—that Abbott would not have undertaken to launch sevoflurane commercially had it not been guaranteed against all competition by Baxter. Yet it is conceded that there was no express covenant not to compete.[7] Baxter gave an exclusive license to the one-step process but no guarantee against competition in sevoflurane produced by some other process. The absence of an express covenant not to compete strongly suggests that such a covenant could not have been the *sine qua non* of Abbott's launching sevoflurane in the United States market.

The majority unquestioningly accepts the contrary proposition of Abbott, that this broad implied noncompete covenant was "a lawful ancillary agreement designed to

---

[7] The majority bolsters its deference argument by glossing over some significant nuances in the various Baxter-Maruishi-Abbott agreements and the arbitral decision. The arbitrators did not hold "that the license is exclusive in the strong sense." Maj. Op. at 3. In fact, the arbitrators found that the license, which is limited solely to the one-step process and all associated know-how and technology, was not violated in any way by Baxter's actions regarding the three-step process. Supp. App. at 13-14. The "strong" noncompete was *implied from the DRA,* which the arbitration panel found contained its own independent cause of action and provided relief to Abbott for *any* conduct by Baxter that reduced the monopoly revenue Abbott would otherwise receive under the one-step licenses. In theory, under the broad language of the arbitral award, even if Baxter invented and brought to market (before 2005) a completely new and different inhalable anesthetic that competed with sevoflurane and reduced Abbott's revenues from it, Baxter would be in violation of the DRA and enjoined from any manufacture and sale. See Supp. App. at 15, ¶¶ 25, 26.

induce Maruishi and its sublicensees to make the investments needed to bring the new drug to market." Maj. Op. at 5. First, as I have already noted, Maruishi has never argued that it needed, or believed it had received, the broad noncompete found by the arbitrators. Second, this statement begs the question of what possible added incentive Abbott could have received from this additional guarantee of monopoly above and beyond the scope of the one-step patent.[8] By agreeing to completely exclude itself from any activity in the sevoflurane market that involved the one-step process, the know-how related to the one-step process or any "improvement" on the technology or know-how of the one-step process patents, Baxter relegated itself to a position identical to that of the other potential competitors that were anticipated by Abbott. Abbott had the incentive to commercialize sevoflurane in the United States with the knowledge that competitors like Ohmeda were lying in wait to "free-ride" on Abbot's regulatory approval and commercialization efforts.

---

[8] I note briefly the questions raised by the Fourth Circuit's decision in *Compton v. Metal Products, Inc.*, 453 F.2d 38 (4th Cir. 1971). In that case, a patentee licensed its patented technology together with a broad (express) noncompete that went far beyond the scope of the patented technology. The court found this agreement not to compete an unlawful restraint of trade. I am unconvinced by the district court's efforts to distinguish *Compton* from the present case on the basis of the degree to which Baxter was restricted. *Abbott Labs. v. Baxter Intern., Inc.*, 2002 WL 467147, *9 (N.D. Ill March 27, 2002). The point of *Compton* is that restraints on competition beyond the scope of the licensed patented technology are unlawful. *Id.* at 45 ("We think that by agreeing to restrictions on his own competition which he could not compel of others, the patentee has extended the monopoly granted by the patent laws beyond its legal bounds."). This agreement to restrictions that extend and enhance the scope of the patent monopoly is also what is objectionable here.

There is no reason why Abbott would lose any of its incentive if Baxter were added to the list of potential competitors (or would gain incentive if Baxter were excluded from the list), so long as Baxter remained excluded from one-step competition and was barred from using any of the know-how and technology associated with its development of the one-step process.[9] I do not think that there could rationally have been any pro-competitive effect from the enhanced noncompete implied by the arbitrators.

Arbitration proceedings aside, and given that a covenant not to compete was not essential to Abbott's market development, Abbott and Baxter could not lawfully agree to this arrangement without violating the Sherman Act, and I fail to see why a panel of arbitrators, on behalf of the parties, can interpret a prior agreement of these parties to reach the same unlawful result.

It is, of course, not the interests of the parties themselves that are primarily at stake in the outcome of this arbitration. Instead the interest of the consuming public is at stake. That public faces higher prices and a constrained supply of sevoflurane as a result of Abbott's monopoly, conferred by the arbitrators. When public rights are at stake, there is good reason to be more reluctant to defer totally to the arbitrators, since they are acting as delegates of the private parties, not of the consuming public. Too deferential an attitude by the courts when the rights of the consuming public are at stake can severely undermine the foundations of our economy. For there

---

[9] In fact, an argument can be made that Baxter was disadvantaged compared to other competitors by virtue of its agreement with Abbott and association with the one-step process. Baxter would face, as it did in the arbitration in the present case, the hurdle of showing that it did not succumb to the temptation to use any of its existing knowledge and technology base, a hurdle not faced by an outside competitor.

can be little doubt that granting Abbott a monopoly to produce sevoflurane in the United States will raise prices and restrict supply. And applying the analysis of the majority to arbitration awards yet to come will open a royal detour around the antitrust laws.

Nor would a denial of the remedy imposed by the arbitrators result in a real loss to Abbott, since Abbott admitted at the arbitration hearing that it had anticipated and planned for generic competition and had specifically anticipated competition from Ohmeda. Arb. Tr. at 323-25; Supp. App. at 19. In fact, Abbott negotiated with Maruishi provisions that would "account[ ] for the downsides of generic competition." Arb. Tr. at 323. The purchase of Ohmeda by Baxter produced a windfall for Abbott whereby Abbott was able to manipulate the arbitration to its advantage and escape the competition it had earlier anticipated.

It is not my role to critique the arbitration decision—however flawed—except in this case to object to its anticompetitive outcome, which orders the parties to violate the antitrust laws. The interest of consumers was not represented on the arbitration panel and the panel's decision ignored consumer interests. Defense of public interests is sometimes better fulfilled by courts than by arbitration panels.

Nor am I much reassured by the substitute antitrust enforcement possibilities mentioned by the majority. It is conceivable that the Federal Trade Commission or the Justice Department might attack Abbott's monopoly conferred by the arbitrators or that another competitor might surface to provide competition from a generic sevoflurane manufactured by some process yet to be invented, but these possible sources of law enforcement or of competition are all hypothetical. I know of no authority for the theory that the existence of hypothetical

sources of antitrust enforcement or of competition can be a defense to an agreement violative of the antitrust laws or to an arbitration award imposing such an agreement.

So while I agree with the majority that antitrust claims are arbitrable, and I also agree that the grounds for refusing to enforce an arbitration award are limited, I do not agree that there is support in the law for the majority's excision of antitrust arbitration from the general framework of judicial review that prohibits an arbitration panel's award from commanding illegal conduct. And in the case before us, the arbitration panel's ruling granting Abbott a monopoly in the United States sevoflurane market commands illegal conduct on the part both of Baxter and Abbott and is unenforceable.

I would remand with instructions not to enforce the arbitral award, and I therefore respectfully DISSENT.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*