# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-3288, 07-3289, 08-3835, 08-3836, 08-3931, 08-3936

SUNSTAR, INC.,

*Plaintiff-Appellant,*
*Defendant-Appellant/Cross-Appellee,*

*v.*

ALBERTO-CULVER COMPANY,

*Defendant-Appellee,*
*Plaintiff-Appellee/Cross-Appellant,*

and

BANK ONE CORPORATION,

*Defendant-Appellee.*

KANEDA, KOSAN, KABUSHIKI KAISHA,

*Defendant-Appellant/Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 01 C 736, 01 CV 5825—**Ronald A. Guzmán**, *Judge*.

ARGUED SEPTEMBER 17, 2009—DECIDED OCTOBER 28, 2009

Before POSNER, MANION, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. This is an immense, unwieldy, complex, multiparty commercial case, now in its ninth year and on its second district judge. The case has been protracted unduly and should probably have been resolved on summary judgment years ago.

The principal issues concern the interpretation of a trademark licensing agreement and Japanese trademark law. In 1980, Alberto-Culver, a major U.S. producer of hair-care and skin-care products (its home page, under hair-care brands, states that "Alberto VO5—the company's flagship brand after 53 years remains a favorite of millions of women and men throughout the world, offering solutions from daily hair care to innovative styling products"), sold Japanese trademark registrations, covering 13 trademarks. The buyer was a Japanese manufacturer of such products named Sunstar (plus an affiliate, Kaneda, Kosan, Kabushiki Kaisha, that need not be discussed separately; we pass over other immaterial facts as well). Most of the trademarks are forms or variants of "VO5"; those that are not have no bearing on the litigation. The forms or variants, as presented in appendices to the license agreement, are as follows:





The agreement of sale provided that upon receiving the trademarks Sunstar would transfer them to Bank One Corporation to hold in trust for 99 years, to license their use during this period to Sunstar, and at the end of the period to return them to Sunstar. If at any time while the trust was in force the trustee had a "reasonable ground" for thinking Sunstar had committed an act that created "a danger to the value or validity of LICENSOR's [i.e., Bank One's] ownership and title in Licensed Trademarks," Sunstar would have to stop using the endangered trademarks until the trustee "reasonably determined" that the danger had passed. In the event of an actual breach of the license by Sunstar, the trustee was to rescind the license and return the trademarks to Alberto-Culver.

The license agreement (the terms of which were negotiated by Sunstar and Alberto-Culver, Bank One's duties being limited to enforcement) calls the license granted Sunstar a *senyoshiyoken*, which in English means "exclusive-use right." The holder of a *senyoshiyoken* not only has an exclusive right to use the licensed trademarks within the geographical scope of the license (see next paragraph) but can sue infringers of the trademarks in its own name. The grantor of the license—in this case the trustee—cannot use the trademarks while the license is in force. Japanese Trademark Act, arts. 25, 30(2), 36(1), 38, 71(1)(iii).

Sunstar, for its part, was forbidden by the agreement to export any products bearing the licensed trademarks to countries in which Alberto-Culver was selling products

under any of the trademarks, had granted an exclusive license to a third party to sell such products, or had registered or applied to register any of the trademarks licensed to Sunstar. Although the agreement forbids Sunstar to register (except for the purpose of defending the licensed trademarks) "any new trademarks containing the names Alberto, Alberto VO5 or VO5 or any of the names or marks set forth in [the appendices to the agreement]," Sunstar is not forbidden to use new trademarks in Japan.

All the products sold under the license are made by Sunstar; as far as the record shows, Alberto-Culver sells no hair-care products—maybe no products, period—in Japan. The agreement does not require Sunstar to pay royalties for using the licensed trademarks; the entire compensation to Alberto-Culver for the license consisted of lump-sum payments (totaling more than $10 million) by Sunstar made in 1980 when the license agreement was made.

The difference between obtaining a 99-year exclusive trademark license with no royalty obligation and buying trademarks outright is small. Sunstar had wanted to buy the trademarks outright but Alberto-Culver had balked because it wanted to restrict Sunstar's ability to use the trademarks in countries in which Alberto-Culver used or might want to use them (these restrictions take up more space in the license agreement than any other subject), and doubtless also because it wanted to be able to recapture and then relicense the use of the trademarks in Japan should Sunstar for some reason stop using them.

In 1989 Sunstar asked Alberto-Culver for permission to license this new variant of the VO5 trademark:



Alberto-Culver refused. Sunstar used the variant anyway, contending that it did not violate the license. But the trustee said it did. Negotiations between Alberto-Culver and Sunstar ensued, and ultimately Sunstar agreed to pay $10 million for the right to add the variant to the list of licensed trademarks and register it, and for some trade secrets.

Ten years later, Sunstar started using a further variant, consisting mainly of a different typeface for "VO5," but also adding a black background and a vertical bar (rather than a space) between the "O" and the "5":



Sunstar describes this as a "modernized" version of the licensed VO5 trademarks, which we assume means alluring to modern Japanese consumers. Alberto-Culver refused to amend the agreement to permit Sunstar to use the modernized version, and, as before, the trustee commanded Sunstar to desist—which it refused to do, instead filing this suit in 2001 against both Alberto-Culver and Bank One. The suit, which invokes federal jurisdiction under 28 U.S.C. § 1332(a)(2) because it is between a foreign citizen (Sunstar) and two U.S. citizens (Alberto-Culver and Bank One), seeks a declaration that Sunstar's use of the mark is permitted by the license. Sunstar sought other relief as well, including damages from Bank One, but has abandoned the additional claims. Alberto-Culver, as a third-party beneficiary of the license agreement, filed a mirror-image suit against Sunstar, seeking damages and injunctive relief, including an order that the license be rescinded and the trademarks returned to Alberto-Culver. The suits were consolidated, and tried to a jury.

The agreement is in English and states that disputes arising under it are to be resolved in accordance with the law of Illinois. But we cannot look to Illinois law to define *senyoshiyoken*, a term the meaning of which is given by Japanese law. Illinois law will not tell us whether the holder of a *senyoshiyoken* can use variants of its licensed trademarks. Alberto-Culver has taken the position that the parties used the term merely to indicate that Sunstar could register the license with the Japanese trademark office, and not to confer on Sunstar the rights that a *senyoshiyoken* confers on the holder under Japanese law. The district judge agreed, and refused to instruct the jury

on the legal meaning of the Japanese term. Under Rule 44.1 of the civil rules, the judge decides the meaning of relevant foreign law and instructs the jury on that meaning, just as it would do in the case of issues of domestic law. The parties had submitted affidavits from experts on Japanese law concerning that meaning, but the judge, thinking the Japanese legal meaning irrelevant, did not try to determine it. Alberto-Culver argues that Sunstar forfeited any challenge to the judge's ruling by failing to ask him to instruct the jury on the legal meaning of *senyoshiyoken*. But he had made his position clear and Sunstar's lawyers' were not required to ask him to reconsider it.

In the course of its deliberations, the jury sent a note to the judge asking: "What exclusive rights does the Senyoshiyoken license give Sunstar PLEASE BE EXPLICIT!" The judge declined to answer, and the jury then returned a verdict for Alberto-Culver, except that it awarded no damages—for the excellent reason that there were none. The judge then enjoined Sunstar from using the variant mark—and also ordered the license agreement terminated because of Sunstar's breach and all the licensed trademarks therefore returned to Alberto-Culver. Alberto-Culver's cross-appeal is from the judge's refusal to grant a broader injunction; we shall not have to consider the merits of the cross-appeal.

We cannot find any basis for the proposition embraced by the district judge that the term *senyoshiyoken* bears a private meaning in the contract. Only if Sunstar was the holder of a *senyoshiyoken* within the meaning that Japanese law assigns to that term, rather than in some

idiosyncratic sense that the parties assigned to it (nor did they say they were doing that), was it authorized to register the license agreement, as Alberto-Culver concedes Sunstar was authorized to do, and to sue in its own name for infringement of the licensed trademarks, as Alberto-Culver also concedes that Sunstar was authorized to do. Japanese Trademark Act, arts. 36(1), 38(2); Kenneth L. Port, *Trademark and Unfair Competition Law and Policy in Japan* 94 (2007). Alberto-Culver does not argue that Sunstar's license is not a "real" s*enyoshiyoken*, but only that such a license doesn't authorize Sunstar to use variants of the licensed trademarks, and that is a question of Japanese law.

When parties to a contract, especially sophisticated parties, use a technical term, there is a presumption that they are using it in its technical sense. *Reed v. Hobbs*, 3 Ill. 297 (1840); *Minges Creek, LLC v. Royal Ins. Co.*, 442 F.3d 953, 956 (6th Cir. 2006); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980); *Superior Business Assistance Corp. v. United States*, 461 F.2d 1036, 1039 (10th Cir. 1972); *Restatement (Second) of Contracts* § 202(3)(b) (1981). (That is American law—but remember the choice of law provision in the license agreement.) If the technical term happens to be a foreign term, the presumption is that it is used in its foreign technical sense. But if the technical term is a foreign technical *legal* term, one might wonder what sense it bears if as in this case the contract provides that domestic law (Illinois law in this case) governs. The wonderment is superficial: the parties can't have meant that the meaning of *senyoshiyoken* would be decided under Illinois law, because the word

has no meaning in that law. And as we said before, unless *senyoshiyoken* was used in its technical legal sense, Sunstar could not have registered the license agreement or enforced the licensed trademarks against infringers.

So we must decide whether the holder of a *senyoshiyoken* is permitted by Japanese law to use variants of the licensed trademarks. Rule 44.1 makes that a question of law. The rule permits foreign law to be proved by testimony or affidavits of experts, and that is the route followed in most cases. But it also permits judges to consult other sources of foreign law, such as articles, treatises, and judicial opinions.

Those are superior sources. When a court in one U.S. state applies the law of another state, or when a federal court applies state law, the court does not permit expert testimony on the meaning of the "foreign" law, even if it is the law of Louisiana, which is based to a significant degree on the French Civil Code. Yet if the law to be applied is the law of a foreign country, even if it is an English-speaking country the legal system of which derives from the same source as ours—England—our courts routinely admit testimony by lawyers on the meaning of the foreign law, see, e.g., *Schexnider v. McDermott Int'l, Inc.*, 868 F.2d 717, 719 n. 2 (5th Cir. 1989) (per curiam), and rely heavily on that testimony.

But the lawyers who testify to the meaning of foreign law, whether they are practitioners or professors, are paid for their testimony and selected on the basis of the convergence of their views with the litigating position of the client or their willingness to fall in with the views urged upon them by the client. Those are banes of expert

testimony. When the testimony concerns a scientific or other technical issue, however, it may be unreasonable to expect a judge to resolve it without the aid of such testimony. But judges are experts on law, and there are published materials on foreign law, in the form of treatises, law review articles, and cases. Of course the most authoritative literature on the law of a foreign country is apt to be in a language other than English. But the parties can have the relevant portions translated into English; judges can handle translations, which figure prominently in a variety of cases tried in American courts, such as drug-trafficking and immigration cases. Relying on paid witnesses to spoon feed judges is justifiable only when the foreign law is the law of a country with such an obscure or poorly developed legal system that there are no secondary materials to which the judge could turn.

The parties presented evidence by expert witnesses concerning the meaning of *senyoshiyoken* in Japanese trademark law. But fortunately the experts cited to scholarly literature as well, which can help us decide whether a *senyoshiyoken* allows its holder to vary a licensed trademark.

Issues of the scope of a trademark usually arise in suits for infringement. The trademark's owner tries to prove that the defendant's mark is confusingly similar to his own, and if he succeeds, this implies that the defendant's variant is within the trademark's scope—it's so like his trademark that no one else is entitled to use the variant in the same market. The issue in this case is not confusion; rather, it is whether the variant is so similar to the orig-

inal that it should be deemed to have been included in the license to use the original.

In U.S. law, a change in a trademark's typeface is not considered a material alteration of the original trademark. *Drexel Enterprises, Inc. v. Richardson*, 312 F.2d 525, 527 (10th Cir. 1962); *Miyano Machinery USA, Inc. v. MiyanoHitec Machinery, Inc.*, 576 F. Supp. 2d 868, 882 (N.D. Ill. 2008). A related rule, called "tacking on," makes the use by a trademark's owner of a variant of his original trademark a defense to a claim that replacing the original with the variant constituted the abandonment (a better word would be forfeiture) of the trademark. So in *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992), the owner of the trademark THIRST-AID "First Aid for Your Thirst" had dropped "First Aid for Your Thirst" and this was held not to be an abandonment of the trademark. See also *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1048 (9th Cir. 1999); *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1115 (S.D.N.Y. 1981); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 17:27, 17:28 (4th ed. 2009).

In a licensing case, "tacking on" becomes a guide to interpretation of the license. A licensee would be reluctant to agree to be prohibited from making modest changes in the appearance or wording of the trademark because it would prevent him from adjusting his marketing of the trademarked product to unpredictable fluctuations in consumer response. Suppose the dropped phrase in the THIRST-AID trademark had been "First Aid for His Thirst" at a time

when the male pronoun was the default pronoun for a person of unspecified gender. As language conventions evolved, the licensee might think it essential, to change "First Aid for His Thirst" to "First Aid for Your Thirst." It would be senseless to consider this a violation of the parties' understanding unless the license had explicitly forbidden any changes.

That is American law and the issue in this case is Japanese law. But the Japanese rule is the same as the American. See *Tokutaro Morikawa v. Foundation Ritoru Waarudo*, 1350 Hanrei Jiho 137 (Tokyo High Ct. Feb. 20, 1990) (LITTLWORLD and LITTLEWORLD), cited in Kenneth L. Port, *Japanese Trademark Jurisprudence* 98 n. 16 (1998); *Limoneira v. Pola Kasei Kogyo K.K.*, 23 Chiteki Saishu 163 (Tokyo High Ct. Feb. 28, 1991) ("the Trademark has a large figure with two lines of letters in smaller size below the figure: one line representing 'POLA' in Roman letters and the other in *katakana* [a Japanese script], whereas the Mark has smaller figure with a large Roman letter representation of 'POLA' on its right and two *katakana* representations . . . placed slantly at the upper-left corner and lower-right corner of the paper strip more than 20 cm away from the said figure and Roman letter elements"); *Heiwado Boeki Kabushiki Kaisha v. Kabushiki Kaisaha Taihei*, 10 Mutai Saishu 193 (Tokyo Dist. Ct. May 12, 1988) (different typeface).

The longer the term of the license, moreover, the less plausible it is to assume, in the absence of express language, that the licensee was forbidden to make even minute changes. The license in this case, the

*senyoshiyoken*, was to continue for 99 years. Over so long a period, changes in language, typefaces, marketing methods, and trademark style would be likely (we are tempted to say would be certain) to require varying the wording or appearance of the licensed mark in order to enable the trademarked product to be marketed effectively. The license may even have *required* Sunstar to make such changes, for remember that the licensee must do nothing that would create a "danger to the value or validity" of the licensed marks, and stubbornly clinging to a dowdy, old-fashioned, "unmodernized" original mark might create an acute danger.

This is especially likely because the right conferred by a *senyoshiyoken* is exclusive of the licensor as well as of potential other licensees. The licensee will be the only user of the trademark in the relevant market and the only entity therefore with either a stake in or a feel for the needs of that market and thus the only entity motivated and able to preserve the value of the trademark by adjusting its appearance. The holder of a *senyoshiyoken*, standing in the shoes of the trademark owner, must have the same right that the owner would have (were there no *senyoshiyoken*) to make small changes. Indeed, the right of a 99-year exclusive licensee to make such changes is more needful than that of the once and far-future owner.

Article 50(1) of the Japanese Trademark Act provides for cancellation of a trademark registration if the registrant—or the holder of a *senyoshiyoken*—has, for more than three years, not been using the trademark. A

registered trademark "includes a trademark consisting of the same letters having modified typefaces . . . [or] of figures having the appearances that can be regarded as the same, or a trademark that can be regarded as the same as the registered trademark in question in the common sense of the society: the same applies in subsequent provisions *of this Article*." Alternatively, and more helpful to Alberto-Culver, a registered trademark "*for the purposes of this Article* . . . includes trademarks which are based on the registered mark but written in a different style than the registered trademark, trademarks with the same sound or meaning as the registered mark . . ., trademarks considered to have the same appearance as the registered trademark, and any other trademarks generally accepted by society as identical to the registered mark." (We have cited both translations because there is no official English translation of Japanese laws.)

Alberto-Culver relies on the passages that we have italicized, especially the second one, which is the more authoritative since it appears in a scholarly book—and by one of Sunstar's expert witnesses! Port, *Japanese Trademark Jurisprudence, supra*, at 143. But whether the quoted provision is meant to exclude variants from the scope of a registered trademark for all purposes other than cancellation is unclear. Such an exclusion would make no sense, at least as applied to this case. Alberto-Culver is not seeking the cancellation of the trademarks. It is seeking to recapture them; and from Sunstar's standpoint it is all the same—if the use of a variant of a trademark does not warrant cancellation because the

variant "can be regarded as the same as the registered trademark in question," why should it warrant the loss of trademark rights?

Moreover, one expects trademark cancellation to be easier in Japan than in the United States because Japan permits registration of trademarks without use, unlike the United States. Japanese Trademark Law, art. 18(1); Port, *Trademark and Unfair Competition Law and Policy in Japan, supra*, at 77-78; Masaya Suzuki, "The Trademark Registration System in Japan: A Firsthand Review and Exposition," 5 *Marquette Intellectual Property L. Rev*. 133, 139-43 (2001); Teruo Doi, *Intellectual Property Protection and Management: Law and Practice in Japan* 182-83 (1992). A pure registration system enables the "banking" of trademarks, which clogs the trademark registry with trademarks that may never be used. Paul J. Heald, "Trademarks and Geographical Indications: Exploring the Contours of the TRIPS Agreement," 29 *Vanderbilt J. Transnational L*. 635, 659 (1996). A requirement of continuous use is therefore more important to unblock the trademark arteries in Japan than in the United States. Even so, Japan does not permit a small variation to destroy trademark rights.

Alberto-Culver further argues, however, that Sunstar violated a provision of the license that requires it to "keep each of the [licensed] Trademarks in continuous use and in a manner and quantity sufficient to meet the statutory requirements as to use." The briefs do not say which of the 13 trademarks Sunstar failed to use continuously, but Sunstar concedes that there were some. Yet at the oral

argument, Alberto-Culver's lawyer conceded in turn that the only consequence of such a failure would be the return to his client of *those* trademarks. To suggest that if Sunstar failed to use any one of the 13 trademarks (or rather 14, because of the 1989 amendment) continuously for 99 years the entire license would be canceled would be ridiculous. It would be especially ridiculous since Alberto-Culver had no financial stake in Sunstar's use of those trademarks, because it had no right to any royalties or other compensation based on that success; it therefore could not be hurt by the abandonment of some or for that matter all of the marks.

The parties presented a good deal of evidence concerning discussions of the license agreement over the course of the many years since it was first made. The discussions indicate that Sunstar may not have attached much significance to the designation of the license as a *senyoshiyoken* (though that is hard to believe, since without that designation it would not have the statutory rights that the status conveys and that Alberto-Culver *concedes* that Sunstar has, apparently without recognizing the significance of the concession), and that it acknowledged that its 1989 variant of VO5 violated the license agreement until amended to allow it. The evidence should not have been admitted. The license agreement grants Sunstar a *senyoshiyoken*. This is a Japanese legal term which, as we said, is to be given the meaning that it bears in Japanese law. That meaning, we have decided as a matter of law (because it is an issue of law), is that the holder of such a license is entitled to make minor

changes in the trademark without being deemed to have exceeded the rights conferred on it by the license.

Alberto-Culver has one more arrow in its quiver. Remember that Sunstar continued to use the variant trademark after being told by the trustee that the use endangered the licensed trademarks. If that determination was based on a "reasonable ground," then Sunstar's continued use of the trademark, until the danger disappeared, was in violation of the agreement. The trustee's determination was unreasonable. (Whether it was in good faith, a question relevant only to Sunstar's attempt to obtain damages from the trustee, is moot now that Sunstar has abandoned the attempt.) We cannot find anything in the record to suggest that Sunstar's use of the variant could reduce the value of the licensed trademarks. Remember that the danger must be to the value or validity of the licensor's, which is to say the trustee's—Bank One's—interest in the trademarks. That interest is confined to their use in Japan, or other countries in which Alberto-Culver has no presence, because it is only the Japanese registrations that were placed in the trust, and they can be used only in Japan or such countries, though people do sometimes move from Japan to another country and their decision whether to buy VO5 in that country might conceivably be influenced by the variant they had seen in Japan.

Even so, we suppose (a variant of the last point) that if Sunstar affixed "VO5" to an illegal product the trustee could cancel the license, on the theory that the outrage would be bound to be communicated to countries in

which Alberto-Culver uses the trademark. And we suppose it could be argued that since Alberto-Culver might some day (before 2079, when the trademarks will be transferred to Sunstar) obtain the return of the trademarks because of some future breach of the license, it has an expectancy that would be destroyed if because of Sunstar's alterations of the trademark, it lost the goodwill that Japanese consumers had bestowed on it. But the challenged variant is too close to the original (that is to say, the 1989 variant licensed to Sunstar) to make any of these dangers more than chimeras.

It is true that the trustee was supposed to watch out for Alberto-Culver's interests in other countries; it is required to rescind the agreement if there is a breach, and sales by Sunstar of products bearing the licensed trademarks in forbidden countries would be a breach. But there is no suggestion of such a violation.

Apparently Sunstar has done better in Japan than Alberto-Culver expected, and, as in 1989, Alberto-Culver has tried to use a hypertechnical, but more important an unsound, interpretation of the licensing agreement to extort additional compensation.

We are tempted simply to order all the claims in this litigation dismissed with prejudice; that would restore the status quo that existed before the trustee complained about Sunstar's use of the variant VO5 trademark. But we'll resist the temptation. Sunstar has not requested such relief (just a new trial and a dismissal of the cross-appeal), and as a result the defendants have not had an opportunity to contest such a request. We doubt that

further trial proceedings are warranted, but leave that decision to be made in the first instance by the district court.

The judgments (including the dismissal of the cross-appeal, as it is premature to determine what injunctive relief if any the defendants are entitled to) are vacated and the case is remanded. 7th Cir. R. 36 shall apply on remand.

VACATED AND REMANDED.