POSNER, Circuit Judge,
concurring.
I join the majority opinion, and write separately merely to express emphatic support for, and modestly to amplify, the court’s criticism of a common and authorized but unsound judicial practice. That is the practice of trying to establish the meaning of a law of a foreign country by testimony or affidavits of expert witnesses, usually lawyers or law professors, often from the country in question. For earlier criticism, see Sunstar, Inc. v. Alberto-Culver Co., 586 F.3d 487, 495-96 (7th Cir. 2009).
*632 The contract in this case is in writing and unambiguously entitles the defendant to continue to sell its “Classic” coffee maker in the United States, because, although it is a product “similar” to the plaintiffs coffee maker, only in France is the defendant forbidden to sell products “similar” to the plaintiffs products. The plaintiff argues that nevertheless it is entitled to a trial at which Jqrgen Bodum, its principal, would testify that part of the deal the parties thought they were making, although it is not reflected in the written contract, was that the defendant would be barred from selling its “Classic” coffee maker in the United States because it is identical rather than merely “similar” to the plaintiffs “Chambord” coffee maker. (Yet the plaintiff concedes in its reply brief that “it may certainly be true that all identical products are similar.”) The issue of contractual interpretation is governed by French law.
Rule 44.1 of the Federal Rules of Civil Procedure provides that a federal court, “in determining foreign law, ... may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.” The committee note explains that the court “may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail.” Thus the court doesn’t have to rely on testimony; and in only a few cases, I believe, is it justified in doing so. This case is not one of them.
The only evidence of the meaning of French law that was presented to the district court or is found in the appellate record is an English translation of brief excerpts from the French Civil Code and affidavits by three French law professors (Pierre-Yves Gautier for the plaintiff and Christophe Caron and Jérome Huet for the defendant, with Huet’s affidavit adding little to Caron’s). The district court did no research of its own, but relied on the parties’ submissions.
When a court in one state applies the law of another, or when a federal court applies state law (or a state court federal law), the court does not permit expert testimony on the meaning of the “foreign” law that it has to apply. Sunstar, Inc. v. Alberto-Culver Co., supra, 586 F.3d at 495; Nationwide Transport Finance v. Cass Information Systems, Inc., 523 F.3d 1051, 1058-59 (9th Cir.2008); Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 (11th Cir.1990); Magee v. Huppin-Fleck, 279 Ill.App.3d 81, 215 IlLDec. 849, 664 N.E.2d 246, 249 (1996). This is true even when it’s the law of Louisiana, see, e.g., Executors of McDonogh v. Murdoch, 56 U.S. (15 How.) 367, 405-06, 14 L.Ed. 732 (1853); Central States, Southeast & Southwest Areas Pension Fund v. Creative Development Co., 232 F.3d 406, 417-18 (5th Cir.2000), which is based to a significant degree on the Code Napoleon (curiously, adopted by Louisiana after the United States acquired Louisiana from France). Id.; Maher v. City of New Orleans, 371 F.Supp. 653, 657-61 (E.D.La. 1974); Rodolfo Batiza, “The Louisiana Civil Code of 1808: Its Actual Sources and Present Relevance,” 46 Tulane L.Rev. 4, 11-12 (1971); Vernon Valentine Palmer, “The French Connection and the Spanish Perception: Historical Debates and Contemporary Evaluation of French Influence on Louisiana Civil Law,” 63 La. L.Rev. 1067, 1072-77 (2003).
Yet if the law to be applied is the law of a foreign country, even a country such as the United Kingdom, Canada, or Australia *633 in which the official language is English and the legal system derives from the same source as ours, namely the English common law, our courts routinely rely on lawyers’ testimony about the meaning of the foreign law. See, e.g., Schexnider v. McDermott Int’l, Inc., 868 F.2d 717, 719 n. 2 (5th Cir.1989) (per curiam); Sphere Drake Ins. Ltd. v. All American Life Ins. Co., 221 F.Supp.2d 874, 884-86 (N.D.Ill. 2002); ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc., 198 F.Supp.2d 598, 622-23 (E.D.Pa.2002). Not only rely but sometimes suggest, incorrectly in light of Rule 44.1, that testimony is required for establishing foreign law. E.g., Interpane Coatings, Inc. v. Australia & New Zealand Banking Group Ltd., 732 F.Supp. 909, 917 (N.D.Ill.1990).
Lawyers who testify to the meaning of foreign law, whether they are practitioners or professors, are paid for their testimony and selected on the basis of the convergence of their views with the litigating position of the client, or their willingness to fall in with the views urged upon them by the client. These are the banes of expert testimony. When the testimony concerns a scientific or other technical issue, it may be unreasonable to expect a judge to resolve the issue without the aid of such testimony. But judges are experts on law, and there is an abundance of published materials, in the form of treatises, law review articles, statutes, and cases, all in English (if English is the foreign country’s official language), to provide neutral illumination of issues of foreign law. I cannot fathom why in dealing with the meaning of laws of English-speaking countries that share our legal origins judges should prefer paid affidavits and testimony to published materials.
It is only a little less perverse for judges to rely on testimony to ascertain the law of a country whose official language is not English, at least if is a major country and has a modern legal system. Although most Americans are monolingual, including most judges, there are both official translations of French statutes into English, Legifrance, “Codes and Texts,” http://195. 83.177.9/code/index.phtml?lang=uk (visited Aug. 4, 2010), and abundant secondary material on French law, including French contract and procedural law, published in English. Barry Nicholas, The French Law of Contract (2d ed.1992); Denis Tallón, “Contract Law,” in Introduction to French Law 205 (George A. Bermann & Etienne Picard eds.2008); Lo'ic Cadiet & Soraya Amrani-Mekki, “Civil Procedure,” in Introduction to French Law, supra, at 307; Stefan Vogenauer, “Interpretation of Contracts: Concluding Comparative Observations,” in Contract Terms 123 (Andrew Burrows & Edwin Peel eds.2007); Daniel Soulez Lariviére, “Overview of the Problems of French Civil Procedure,” 45 Am. J. Comp. L. 737, 743-44 (1997); James Beardsley, “Proof of Fact in French Civil Procedure,” 34 Am. J. Comp. L. 459 (1986). Neither party cited any such material, except translations of statutory provisions; beyond that they relied on the affidavits of their expert witnesses.
Because English has become the international lingua franca, it is unsurprising that most Americans, even when otherwise educated, make little investment in acquiring even a reading knowledge of a foreign language. But our linguistic provincialism does not excuse intellectual provincialism. It does not justify our judges in relying on paid witnesses to spoon feed them foreign law that can be found well explained in English-language treatises and articles. I do not criticize the district judge in this case, because he was following the common practice. But it is a bad practice, followed like so many legal practices out of habit rather than reflection. It is excusable only when the foreign law is the law of *634 a country with such an obscure or poorly developed legal system that there are no secondary materials to which the judge could turn. The French legal system is obviously not of that character. The district court could — as this court did in Abad v. Bayer Corp., 563 F.3d 663, 670-71 (7th Cir.2009), with respect to the law of Argentina — have based his interpretation of French contract law on published writings as distinct from paid testimony.
Of course often the most authoritative literature will be in the language of the foreign country. But often too there will be official, or reputable unofficial, translations and when there are not the parties can have the relevant portions translated into English. Translations figure prominently in a variety of cases tried in American courts, such as drug-trafficking and immigration cases; why not in cases involving foreign law?
Article 1156 of the French Civil Code— the provision that the briefs principally discuss — states in its entirety: “On doit dans les conventions rechercher quelle a été la commune intention des parties contrastantes, plutbt que de s’arréter au sens littéral des termes.” In idiomatic English (the official English version is stilted), this means that in interpreting a contract one should search for what the parties’ joint intention was, rather than stopping with the literal meaning of the contract’s terms. The plaintiff argues that this means that no matter how clear the contract appears to be, a party is entitled to present evidence at trial that the parties intended something else. “French law,” according to the plaintiffs opening brief, “clearly provides that an assessment of the parties’ rights and obligations under the [contract] must be evaluated in light of the parties’ mutual intent, regardless of whether the contract is deemed unambiguous.”
What is true and worth noting is that the civil law — the law of Continental Europe, as distinct from Anglo-American law — of contracts places an emphasis on fault that is not found in the common law. As Holmes remarked, the common law conceives of contracts as options — when you sign a contract in which you promise a specified performance you buy an option to either perform as promised or pay damages, Oliver Wendell Holmes, “The Path of the Law,” 10 Harv. L.Rev. 457, 462 (1897), unless damages are not an adequate remedy in the particular case. Whether you were at fault in deciding not to perform— you could have done so but preferred to pay damages because someone offered you a higher price for the goods that you’d promised to the other party to your contract — is therefore irrelevant.
In the civil law, in contrast, a party is in breach of his contract and therefore subject to a legal sanction only if he “could reasonably have been expected to behave in a different way,” that is, only if he was at fault in failing to perform. Jürgen Basedow, “Towards a Universal Doctrine of Breach of Contract: The Impact of the CISG,” 25 Int’l Rev. L. & Econ. 487, 496 (2005) (“the fault principle is often considered to be an indispensable part of the law of obligations in civil law countries”); see also Nicholas, supra, at 200-01; Tallón, supra, at 224-25, 230-31; Richard Hyland, “Pacta Sunt Seiwanda: A Meditation,” 34 Va. J. Int’l L. 405, 429-30 (1994); John Y. Gotanda, “Recovering Lost Profits in International Disputes,” 36 Georgetown J. Int’l L. 61, 76-77 (2004). The civil law embraces the slogan pacta sunt servanda — promises are to be obeyed, not commuted to a price believed to approximate their value. That is why in the civil law the default remedy for breach of contract is (though more in principle than in practice) specific performance rather than damages. Nicholas, supra, at 211-12; *635 Ronald J. Scalise, Jr., “Why No ‘Efficient Breach’ in the Civil Law?: A Comparative Assessment of the Doctrine of Efficient Breach of Contract,” 55 Am. J. Comp. L. 721, 726-27 (2007); see Tallón, supra, at 233-34; John P. Dawson, “Specific Performance in France and Germany,” 57 Mich. L.Rev. 495, 524-25 (1959). You should have performed your promise, so the court will order you to do so.
The common law of contracts evolved from the law merchant, the civil law of contracts from canon law. Joseph M. Perillo, “UNIDROIT Principles of International Commercial Contracts: The Black Letter Text and a Review,” 63 Fordham L.Rev. 281, 308 n. 190 (1994). Priests do not take promise breaking quite as lightly as businessmen, but on the other hand are not attuned to commercial usages, such as options. Yet despite the difference in origins, differences in outcome under the two legal regimes are small and shrinking. E.g., Stefan Grundmann, “The Fault Principle as the Chameleon of Contract Law: A Market Function Approach,” 107 Mich. L.Rev. 1583, 1586-91 (2009); Vogenauer, supra, at 149-50; Wayne R. Barnes, “Contemplating a Civil Law Paradigm for a Future International Commercial Code,” 65 La. L.Rev. 677, 751-52 (2005); Gotanda, supra, at 63-64; Patricia Pattison & Daniel Herron, “The Mountains Are High and the Emperor Is Far Away: Sanctity of Contract in China,” 40 Am. Bus. L.J. 459, 475 (2003). A difference at least in tone remains, however, and enables one to see why French law might, as the plaintiff contends, be more concerned to determine the parties’ intentions than American law would be. For if an intention is innocent — a party never intended the promise that he is now accused of having broken— ascribing fault to him, viewed as a precondition to finding him guilty of a breach of contract, is a graver step. Conversely, if the party did intend the promise but somehow it failed to get written down intelligibly, he should not be permitted to break it by pointing to a writing. Hence the greater “readiness [of French courts] to have recourse to previous negotiations and subsequent conduct of the parties” in interpreting a contract, Vogenauer, supra, at 150 — to conduct a deeper search into subjective understandings.
The civil-law culture is the basis for the plaintiffs claim to be entitled to a trial at which to present evidence that its contract with the defendant was intended to mean something different from what it says. This claim cannot be derived from Article 1156, which, as the majority opinion in this case points out, just tells the court to search for what the parties’ joint intention was rather than stopping with the literal meaning of the contract’s terms. That is no different from warnings in American contract law to be wary of literal interpretations of contracts because such interpretations often are mistaken. Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 860 (7th Cir.2002); Rhode Island Charities Trust v. Engelhard Corp., 267 F.3d 3, 6-7 (1st Cir.2001); Outlet Embroidery Co. v. Derwent Mills, 254 N.Y. 179, 172 N.E. 462, 463 (1930) (Cardozo, C.J.). It is based rather on the greater willingness (in principle — which will turn out to be an essential qualification) of a French court than of an American one to dig deeply for reassurance that it is not distorting the parties’ intentions by blinding itself to everything that is not text.
The argument may seem to be supported by the fact that French law does not have a parol evidence rule applicable to commercial cases. See French Commercial Code, Art. 110-3; CISG-AC [Advisory Council of the Convention of International Sale of Goods], Opinion No. 3, “Parol Evidence Rule, Plain Meaning Rule, Contractual Merger Clause and the *636 CISG,” ¶ 1.2.8 (Oct. 23, 2004), www.cisg. law.pace.edu/cisg/CISG-AC-op3.html (visited Aug. 6, 2010); Alberto Luis Zuppi, “The Parol Evidence Rule: A Comparative Study of the Common Law, the Civil Law Tradition, and Lex Mercatoria," 35 Ga. J. Int’l & Comp. L. 233, 258-60 (2007); Arthur T. von Mehren, “Civil-Law Analogues to Consideration: An Exercise in Comparative Analysis,” 72 Harv. L.Rev. 1009, 1013 and n. 15 (1959). An approximation to that rule, and to the related “four corners” rule, Bank v. Truck Ins. Exchange, 51 F.3d 736, 737-38 (7th Cir.1995); E. Allan Farnsworth, Contracts § 7.12, p. 464 (4th ed.2004), which forbids using extrinsic evidence to contradict an unambiguous written contract, is found in Article 1341 of the French Civil Code for ordinary contracts unless very small. (Neither rule is limited to oral evidence, despite the word “parol,” which is derived from the French word for “word”; the parol evidence rule merely excludes extrinsic evidence concerning precontractual negotiations if the written contract was intended to be the parties’ complete agreement, Utica Mutual Ins. Co. v. Vigo Coal Co., 393 F.3d 707, 713-14 (7th Cir.2004); see also Patton v. Mid-Continent Systems, Inc., 841 F.2d 742, 745-46 (7th Cir.1988); Farnsworth, supra, § 7.2, pp. 414-16).) Article 1341 bars “proof by witnesses” that is inconsistent with the written contract unless there is a “commencement of proof in writing” — a writing originating with the defendant that makes it probable that an alleged fact about the parties’ deal is true. Vogenauer, supra, at 135-37; Jacques H. Herbots, “Interpretation of Contracts,” in Jan M. Smits, The Elgar Encyclopedia of Comparative Law 325, 337 (2006).
But the limitations on extrinsic evidence in Article 1341 do not apply to commercial contracts, a possible characterization of the contract at issue in this case, though not an inevitable characterization for reasons explained in the majority opinion. Article 110-3 of the French Commercial Code provides that “with regard to traders, commercial instruments may be proven by any means unless the law specifies otherwise” (footnote omitted). And CISGAC Opinion No. 3, supra, states that “though the French Civil Code ... incorporates a version of the Parol Evidence Rule for ordinary contracts, all forms of proof are generally available against merchants.” See also United Nations Convention on Contracts for the International Sale of Goods, art. 11, 52 Fed.Reg. 6262, 6265 (Mar. 2, 1987); Louis F. Del Duca, “Implementation of Contract Formation Statute of Frauds, Parol Evidence, and Battle of Forms CISG Provisions in Civil and Common Law Countries,” 38 UCC L.J. 55, 56-57 and n. 3 (2005).
This gap in French commercial law has little practical significance, however, because it mainly reflects the fact that civil law systems do not use juries in civil cases. As a result, their rules on admissibility of evidence are notably looser than in common law jurisdictions. Frederick Schauer, “On the Supposed Jury-Dependence of Evidence Law,” 155 U. Pa. L.Rev. 165, 174-75 (2006); Kenneth Williams, “Do We Really Need the Federal Rules of Evidence?,” 74 N. Dak. L.Rev. 1, 21-22 (1998); Konstantinos D. Kerameus, “A Civilian Lawyer Looks at Common Law Procedure,” 47 La. L.Rev. 493, 499-503 (1987). Although technically the parol evidence and four-corners rules are rules of contract law rather of evidence, Rossetto v. Pabst Brewing Co., 217 F.3d 539, 546 (7th Cir.2000); Farnsworth, supra, § 7.2, p. 416, they are strongly influenced by concern lest trial by jury upset the expectations of contracting parties as embodied in written contracts. AM Int’l Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 576 (7th Cir.1995); Olympia Hotels *637 Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1373 (7th Cir.1990); Charles T. McCormick, “The Parol Evidence Rule as a Procedural Device for Control of the Jury,” 41 Yale L.J. 365 (1932).
Unburdened by juries and tight rules of evidence, French courts could range further afield than American courts in search of subjective contractual intentions. Could — but don’t. As explained in Vogenauer, supra, at 135-36, while “as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation ... this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to ‘add to, vary or contradict a deed or other written instrument.’ On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially ‘right’ outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors.... Extrinsic evidence can, however, be used for the purposes of interpreting a written document that contains internal contradictions or is otherwise unclear” (emphasis added, footnote omitted) — which is also true of American law, but irrelevant to this case.
Unlike American courts, moreover, “French commercial courts are staffed by members of the business community, who serve part-time as judges. There is no requirement that they have legal training. Hearings before French commercial courts typically last less than an hour. Witnesses are virtually never heard by the court. In any case, a French rule of evidence makes evidence originating from any of the parties inadmissible, which means that no employee of any of the two companies may validly testify.” Gilíes Cuniberti, “Beyond Contract — The Case for Default Arbitration in International Commercial Disputes,” 32 Fordham Int’l L.J. 417, 431-32 (2009) (footnote omitted). “The past continues to shape the present. This is especially true with respect to one particularity of the French judicial system which is rarely evoked — the absence of a jury in civil court proceedings, and the consequences this has on procedure, which remains 98% written, with no witnesses, no investigations ordered by the judge, and no cross-examination. The hearing is a sort of ritual, a rigid, immutable show in which the silent judge, flanked — for the moment at least — by two colleagues, listens to the ‘pleadings’: an exercise in solitary eloquence, a lengthy monologue by a lawyer who blindly and desperately attempts to breathe life into documents, or even affidavits, which are inert, consigned to paper, embedded in ritual phraseology, and accompanied by a document proving identity. It is the absence of any jury which has dictated the entire concept of what a civil court hearing should be.” Lariviére, supra, at 743-44. “[T]he tendency [in French civil litigation is] to prefer written proof of ultimate fact — evidence that can be analyzed on the basis of a writing even though its origins may be in oral testimony or other more difficult-to-appreciate forms of proof.” Beardsley, supra, at 470.
The plaintiff in our case wants to marry French substantive doctrine that might appear to permit a more far-ranging evidentiary exploration in a contract case to American trial procedure, which permits a far-ranging evidentiary exploration in many types of case but not in cases charging a breach of a clear written contract. The marriage has produced an ungainly hybrid that corresponds neither to French law nor to American law. It is true that *638 some foreign legal systems heavily influenced by the civil codes do use common law procedure — as does Louisiana. Stephen Goldstein, “The Odd Couple: Common Law Procedure and Civilian Substantive Law,” 78 Tul. L.Rev. 291 (2003). These typically are former code jurisdictions that were conquered, or in the case of Louisiana bought, by a common law nation such as Britain or the United States. But they do not do it on an ad hoc basis, as proposed by our plaintiff; and, so far as I can discover, they do not, by doing so, deny contracting parties the protection of a clearly written contract.
It is at least as difficult to persuade a French court (because of its composition and usages) to admit extrinsic evidence in a contract case as it is to persuade an American court to do so. See Cuniberti, supra, at 431-32; Lariviére, supra, at 743-44; Beardsley, supra, at 469-70. The happenstance that this case has been brought in an American court must not be allowed to produce a misfit between substantive and procedural law.
Curiously, one of the defendant’s experts, Professor Caron, not only cites Article 1156 but asserts that in interpreting the “common intention of the parties ... reference to the negotiations that may have taken place between the parties should be required.” I don’t think he means that there is a legal requirement; there isn’t. I think he means it would be helpful to refer to the previous negotiations in this case because they support the defendant’s position. Yet in its brief the defendant goes further and says that “Article 1156 simply requires that a court look beyond the literal meaning of the terms of an agreement, even where — as here — the terms of the agreement are plain and unambiguous” (emphasis added). This is not a correct interpretation of French law, or even one helpful to the defendant, since the contract unambiguously supports its position. The defendant acknowledges, on the basis of what appears to be its expert’s misunderstanding or misstatement of French law, that it is not enough that the contract be unambiguous; the evidence of subjective intention must also be. Among other things this ignores the following exception, which is not inapplicable to commercial contracts, to the principle that “judicial interpretation of contracts is considered to entail questions of fact and therefore be subject to the discretion of the lower courts”: in “cases in which there has been a distortion (une dénaturation) of the clear and precise terms of the contract ..., the court is deemed to be faced not merely with a question of the interpretation of a contract, but rather a refusal to apply it.” Tallón, supra, at 225; see also Herbots, supra, at 334. It must not refuse to apply it.
The parties’ reliance on affidavits to establish the standard for interpreting their contract has produced only confusion. They should have relied on published analyses of French commercial law.