In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1892

BODUM USA, INC.,

*Plaintiff-Appellant*,

*v.*

LA CAFETIÈRE, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 6302—**Matthew F. Kennelly**, *Judge*.

ARGUED SEPTEMBER 11, 2009—DECIDED SEPTEMBER 2, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER and
WOOD, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  From the mid-1950s through
1991, Société des Anciens Etablissements Martin S.A.
("Martin") distributed a successful French-press coffee
maker known as the Chambord. A French-press coffee
maker (called a cafetière à piston in France) is a carafe
in which hot water is mixed with coffee grounds. When
the brewing is complete, a mesh screen attached to a rod

drives the grounds to the bottom of the carafe. Clear coffee then can be poured from the top. In 1991 Bodum Holding purchased all of Martin's stock. Today subsidiaries of Bodum Holding sell throughout the world coffee makers that use the Chambord design and name.

Martin's principal investor and manager was Louis-James de Viel Castel, who had other businesses. One of these, the British firm Household Articles Ltd., sold a French-press coffee maker that it called La Cafetière, which closely resembles the Chambord design. Viel Castel wanted to continue Household's business after Bodum bought Martin. So Viel Castel and Jørgen Jepsen Bodum, the main investor in Bodum Holding, negotiated. An early draft agreement provided that Household could sell the Chambord design in the United Kingdom, but nowhere else. After several rounds of revisions, however, the agreement provided that Household would never sell a French-press coffee maker in France, that it would not use the trade names Chambord or Melior, and that for four years it would not distribute through the importers, distributors, or agents that Martin employed during 1990–91. The agreement was signed, and Bodum Holding acquired Martin.

La Cafetière, Inc., was incorporated in Illinois in 2006 to serve as the distributor of Household's products in the United States. One of these is the La Cafetière model, which carries the name "Classic" in this country. To avoid confusion between the corporation (which since 2008 has been one of Household's subsidiaries) and the product, we refer to the distributor as "Household."

Household has itself been renamed The Greenfield Group, but we stick with the original name for simplicity. Bodum Holding's US distributor (Bodum USA, Inc.) filed this suit under federal and state law, contending that the sale of any coffee maker similar to the Chambord design violates Bodum's common-law trade dress. Trade dress, a distinctive appearance that enables consumers to identify a product's maker, is a form of trademark. See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992). The Chambord design is not registered as Bodum's trademark, but common-law marks may be enforced under both 15 U.S.C. §1125(a), a part of the Lanham Act, and 815 ILCS 510/2(a). Household contends that the 1991 agreement permits it to sell the La Cafetière design anywhere in the world, except France, provided that it does not use the words Chambord or Melior—and Household has never used either of those marks. The district court agreed with this contention and granted summary judgment in Household's favor. 2009 U.S. Dist. LEXIS 25555 (N.D. Ill. Mar. 24, 2009).

The Chambord design and the La Cafetière design are indeed similar, and although they are not identical a casual coffee drinker (or purchaser) would have trouble telling them apart. Here are pictures:



Chambord design, full     Chambord design, empty



La Cafetière design, full          La Cafetière design, empty

The right-hand version of the La Cafetière design looks closer to the Chambord design because of the domed lid and the ball on the piston. Household calls one design the Classic and the other the Optima; the parties do not make anything of the difference.

Bodum assumes that the proprietor of any distinctive design has an intellectual-property right in this design, which it alone can sell. That assumption is unwarranted. The Chambord design is distinctive—so much so that Martin received a design patent for it—but the patent expired many years ago. After a patent expires, other firms are free to copy the design to the last detail in order to increase competition and drive down the price

that consumers pay. See, e.g., *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225 (1964). See also *Jay Franco & Sons, Inc. v. Franek*, No. 09-2155 (7th Cir. Aug. 11, 2010); *Specialized Seating, Inc. v. Greenwich Industries, L.P.*, No. 07-1435 (7th Cir. Aug. 11, 2010). A distinctive design may be protected as a trademark only if it has acquired secondary meaning—that is, if consumers associate the design with a particular manufacturer—and the design's identifying aspects are not functional. See *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205 (2000). Bodum has not produced evidence that the Chambord design has secondary meaning, so that purchasers of a La Cafetière coffee maker think that they are getting one of Bodum's products. But because Household has not asked us to affirm the district court on this ground, we move on to the contract.

Here is the critical language, from Article 4 of the contract:

> In consideration of the compensation paid to Stockholder [Viel Castel] for the stocks of [Martin,] Stockholder guarantees, limited to the agreed compensation, see Article 2, that he shall not—for a period of four (4) years—be engaged directly or indirectly in any commercial business related to manufacturing or distributing [Martin's] products . . . . . . .

> Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder through Household . . . can manufacture and distribute any products similar

> to [Martin's] products outside of France. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to any such activity in France, and that Household [ ] furthermore is not entitled, directly or indirectly, globally to manufacture and/or distribute coffeepots under the trade marks and/or brand names of "Melior" and "Chambord," held by [Martin]. Stockholder agrees that Household [ ] is not entitled to use for a period of four (4) years the importers, distributors, and agents which [Martin] uses and/or has used the last year. Any violation of these obligations will constitute a breach of Stockholder's obligation according to Article 4.

The parties agree that this is an accurate translation of the French original, and that French substantive law governs its interpretation. The district judge thought that the contract is clear and that Household can sell its La Cafetière outside of France, if it does not use the Chambord or Melior names. Even if the La Cafetière or Classic model is identical to the Chambord model (which it is not, as a glance at the illustrations shows), a thing identical to something else also is "similar" to it.

Bodum contends that, under French law, the parties' intent prevails over the written word. Article 1156 of the French Civil Code provides: "One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms." (Again this is an agreed translation, as are all other translations in this opinion.) Jørgen

Bodum has submitted an affidavit declaring that he understood the contract to limit Household's sales of the La Cafetière model to the United Kingdom and Australia. This means, Bodum Holding insists, that there must be a trial to determine the parties' intent. It supports this position with the declaration of Pierre-Yves Gautier, a Professor of Law at Université Panthéon-Assas Paris II, who Bodum tenders as an expert on French law. Household has replied with declarations from two experts of its own.

Although Fed. R. Civ. P. 44.1 provides that courts may consider expert testimony when deciding questions of foreign law, it does not compel them to do so—for the Rule says that judges "may" rather than "must" receive expert testimony and adds that courts may consider "any relevant material or source". Judges should use the best of the available sources. The Committee Note in 1966, when Rule 44.1 was adopted, explains that a court "may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail."

Sometimes federal courts must interpret foreign statutes or decisions that have not been translated into English or glossed in treatises or other sources. Then experts' declarations and testimony may be essential. But French law, and the law of most other nations that engage in extensive international commerce, is widely

available in English. Judges can use not only accepted (sometimes official) translations of statutes and decisions but also ample secondary literature, such as treatises and scholarly commentary. It is no more necessary to resort to expert declarations about the law of France than about the law of Louisiana, which had its origins in the French civil code, or the law of Puerto Rico, whose origins are in the Spanish civil code. No federal judge would admit "expert" declarations about the meaning of Louisiana law in a commercial case.

Trying to establish foreign law through experts' declarations not only is expensive (experts must be located and paid) but also adds an adversary's spin, which the court then must discount. Published sources such as treatises do not have the slant that characterizes the warring declarations presented in this case. Because objective, English-language descriptions of French law are readily available, we prefer them to the parties' declarations. See *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495–96 (7th Cir. 2009); *Abad v. Bayer Corp.*, 563 F.3d 663, 670–71 (7th Cir. 2009).

Article 1156 says that courts must seek the parties' "common intention"—which means their *joint* intent, not one side's unilateral version. Jørgen Bodum tells us what he understood by the contract, but Bodum Holding does not offer any evidence of statements by Viel Castel that would tend to demonstrate that this view is mutual. For its part, Household offers the contract's negotiating history, which French law takes to be a more reliable indicator of intent than the litigants' self-

serving declarations. See Alberto Luis Zuppi, *The Parol Evidence Rule: A Comparative Study of the Common Law, the Civil Law Tradition, and Lex Mercatoria*, 35 Ga. J. Int'l & Comp. L. 233, 258–60 (2007).

Article 1341 of the Civil Code forbids evidence about what negotiators said to one another—often called parol evidence in the United States—when the value of the dispute exceeds 5,000 francs (roughly 800 euros). The value of the dispute between Bodum and Household exceeds 5,000 francs, so what the negotiators said to each other is irrelevant under Art. 1341. This constraint illustrates the proposition that although "as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation . . . this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to 'add to, vary or contradict a deed or other written instrument.' On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially 'right' outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors . . . . Extrinsic evidence can, however, be used for the purposes of interpreting a written document that contains internal contradictions or is otherwise unclear"—something true of American law as well. Stefan Vogenauer, "Interpretation of Contracts: Concluding Comparative Observations," in *Contract Terms* 123, 135–36 (Andrew Burrows & Edwin Peel eds. 2007).

Article 110–3 of the Commercial Code is more tolerant of oral parol evidence, but it is not clear whether the Commercial Code governs the sale to Bodum Holding of Viel Castel's stock in Martin. The Commercial Code applies to "all obligations between dealers, merchants, and bankers". Art. 110–2. The contract by which Viel Castel sold his stock was a hybrid, affecting the business of Household as a merchant at the same time as it affected Viel Castel as an investor. It is unnecessary to decide whether Art. 110–3 applies, however, because Bodum Holding does not offer any parol evidence that would tend to show Viel Castel's oral agreement with Jørgen Bodum's beliefs. This leaves the written record.

The negotiating history is straightforward. Bodum's lawyers submitted an initial draft for Viel Castel's consideration. The relevant provision said this:

> In consideration of the compensation paid to Stockholder [Viel Castel] for the stock of [Martin,] Stockholder guarantees that he shall not—for an indefinite period of time—be engaged directly or indirectly in any commercial business related to manufacturing and/or distributing [Martin's] products . . . . . . .

> Notwithstanding article 4 [Bodum Holding] agrees that Stockholder through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to distribute products outside the United Kingdom.

Viel Castel rejected this proposal and negotiated to allow Household the right to sell the La Cafetière design outside the United Kingdom. The next draft said this:

> Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder [Viel Castel] through Household . . . can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, globally to manufacture and/or distribute coffee-pots under the trade marks and/or brand names of "Melior" and "Chambord". [Bodum Holding] agrees that Household [ ] with the limitation mentioned in the previous sentence outside of the United Kingdom on markets where Household [ ] prior to signing of this Agreement has proved to [Bodum Holding] that he is already manufacturing/distributing products can manufacture and distribute products which, directly or indirectly, do not compete with the business of the Company as run today.

This, too, was unacceptable to Viel Castel. Eventually the parties signed the final version that we quoted several pages ago. The lesson is easy to grasp. The initial draft placed on Household the sort of restriction that Jørgen Bodum imputes to the final version. But the final version allows Household to sell the La Cafetière design anywhere except France—provided that it does not use the Chambord or Melior names (which Household has never done) and does not use Martin's supply channels for four years (a promise Household kept).

The Cour de Cassation (France's highest civil court) has concluded that a clear and precise contract must not be "denatured" by resort to one party's declaration of intent. See Jacques H. Herbots, "Interpretation of Contracts" in *The Elgar Encyclopedia of Comparative Law* 334–35 (2006); Cass. 2e civ., March 8, 2006, Bull. Civ. II, No. 66. Article 4 of this contract is clear and precise as it stands; the negotiating history shows that it means what it says. And we are not the first court to reach this conclusion. Bodum and another of Household's subsidiaries litigated in Denmark. Relying heavily on the negotiating history, the Court of Randers concluded, in a judgment dated February 8, 2008 (Case FS 40-6066/2007), that Article 4 means exactly what the district judge held in this litigation. The Court of Randers reached its judgment under French law (which a choice-of-law clause in the contract requires). The judgment was affirmed by the Western Danish High Court on May 12, 2009 (Appeal No. V.L. B-0329-08, Ref. No. 138212). It would not be sensible to create an international conflict about the interpretation of this contract. Denmark is a civil-law nation, and a Danish court's understanding and application of the civil-law tradition is more likely to be accurate than are the warring declarations of the paid experts in this litigation.

When the facts are undisputed, interpretation of contractual language is a question of law for the judge. See *PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 971 (7th Cir. 1994). Bodum contends that the French preference for intent over text means that interpretation must be a question of fact. But in the United States, too, contractual

interpretation seeks to find the parties' shared intent. And in the United States, as in France, this is done by objective means (through devices such as the negotiating history) rather than attempting to read the parties' minds. See *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810 (7th Cir. 1987).

If this dispute were proceeding in France, it would not be submitted to lay jurors (which France does not use) or even to a judge. It would be submitted to an arbitral panel of business executives, the International Court of Commerce in Paris, as Article 18 of the contract provides. Bodum has not asked that this dispute be arbitrated, in Chicago or Paris, although that might have been preferable. That the suit depends on a mixture of U.S. trademark law and French contract law would not prevent arbitration. See *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985); *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600 (7th Cir. 1994); *Baxter International, Inc. v. Abbott Laboratories*, 315 F.3d 829 (7th Cir. 2003). Having chosen to litigate in Chicago rather than arbitrate in Paris, however, Bodum must abide by the forum's procedural doctrines, such as the allocation of tasks between judge and jury. See *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir. 1994).

Bodum insists that, if the 1991 contract means what we have concluded it means, the agreement is invalid as a "naked license" of a trademark. American law forbids "naked" transfers of trademarks. *TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876 (7th Cir. 1997). A business cannot sell a name divorced from a product,

because a trademark is significant only to the extent it helps consumers associate a product with a producer. But Bodum did not sell a naked trademark to Household. Before 1991, Martin and Household had allocated rights to the Chambord design: Martin sold coffee makers embodying this design in some nations, Household in others. The 1991 contract continued that division. The names Chambord and Melior went to Bodum; the design stayed where it was, and Household promised not to sell it in France, where in 1991 Martin did about 70% of its business. No transfer of any rights *to* Household occurred; the transfer was from Martin to Bodum, with a reservation of some existing rights in Household. People are free to use contracts to allocate rights to products' designs. See *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979).

None of the other arguments requires discussion. The judgment is affirmed.

POSNER, *Circuit Judge*, concurring. I join the majority opinion, and write separately merely to express emphatic support for, and modestly to amplify, the court's criticism of a common and authorized but unsound judicial practice. That is the practice of trying

to establish the meaning of a law of a foreign country by testimony or affidavits of expert witnesses, usually lawyers or law professors, often from the country in question. For earlier criticism, see *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495-96 (7th Cir. 2009).

The contract in this case is in writing and unambiguously entitles the defendant to continue to sell its "Classic" coffee maker in the United States, because, although it is a product "similar" to the plaintiff's coffee maker, only in France is the defendant forbidden to sell products "similar" to the plaintiff's products. The plaintiff argues that nevertheless it is entitled to a trial at which Jørgen Bodum, its principal, would testify that part of the deal the parties *thought* they were making, although it is not reflected in the written contract, was that the defendant would be barred from selling its "Classic" coffee maker in the United States because it is identical rather than merely "similar" to the plaintiff's "Chambord" coffee maker. (Yet the plaintiff concedes in its reply brief that "it may certainly be true that all identical products are similar.") The issue of contractual interpretation is governed by French law.

Rule 44.1 of the Federal Rules of Civil Procedure provides that a federal court, "in determining foreign law, . . . may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." The committee note explains that the court "may engage in its own research and consider any relevant material thus found. The court may have at its disposal

better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail." Thus the court doesn't *have* to rely on testimony; and in only a few cases, I believe, is it justified in doing so. This case is not one of them.

The only evidence of the meaning of French law that was presented to the district court or is found in the appellate record is an English translation of brief excerpts from the French Civil Code and affidavits by three French law professors (Pierre-Yves Gautier for the plaintiff and Christophe Caron and Jérôme Huet for the defendant, with Huet's affidavit adding little to Caron's). The district court did no research of its own, but relied on the parties' submissions.

When a court in one state applies the law of another, or when a federal court applies state law (or a state court federal law), the court does not permit expert testimony on the meaning of the "foreign" law that it has to apply. *Sunstar, Inc. v. Alberto-Culver Co., supra*, 586 F.3d at 495; *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008); *Montgomery v. Aetna Casualty & Surety Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990); *Magee v. Huppin-Fleck*, 664 N.E.2d 246, 249 (Ill. App. 1996). This is true even when it's the law of Louisiana, see, e.g., *Executors of McDonogh v. Murdoch*, 56 U.S. (15 How.) 367, 405-06 (1853); *Central States, Southeast & Southwest Areas Pension Fund v. Creative Development Co.*, 232 F.3d 406, 417-18 (5th Cir. 2000), which is based to a significant degree on the *Code Napoléon* (curiously,

adopted by Louisiana after the United States acquired Louisiana from France). *Id.*; *Maher v. City of New Orleans*, 371 F. Supp. 653, 657-61 (E.D. La. 1974); Rodolfo Batiza, "The Louisiana Civil Code of 1808: Its Actual Sources and Present Relevance," 46 *Tulane L. Rev.* 4, 11-12 (1971); Vernon Valentine Palmer, "The French Connection and the Spanish Perception: Historical Debates and Contemporary Evaluation of French Influence on Louisiana Civil Law," 63 *La. L. Rev.* 1067, 1072-77 (2003).

Yet if the law to be applied is the law of a foreign country, even a country such as the United Kingdom, Canada, or Australia in which the official language is English and the legal system derives from the same source as ours, namely the English common law, our courts routinely rely on lawyers' testimony about the meaning of the foreign law. See, e.g., *Schexnider v. McDermott Int'l, Inc.*, 868 F.2d 717, 719 n. 2 (5th Cir. 1989) (per curiam); *Sphere Drake Ins. Ltd. v. All American Life Ins. Co.*, 221 F. Supp. 2d 874, 884-86 (N.D. Ill. 2002); *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.*, 198 F. Supp. 2d 598, 622-23 (E.D. Pa. 2002). Not only rely but sometimes suggest, incorrectly in light of Rule 44.1, that testimony is *required* for establishing foreign law. E.g., *Interpane Coatings, Inc. v. Australia & New Zealand Banking Group Ltd.*, 732 F. Supp. 909, 917 (N.D. Ill. 1990).

Lawyers who testify to the meaning of foreign law, whether they are practitioners or professors, are paid for their testimony and selected on the basis of the convergence of their views with the litigating position of the client, or their willingness to fall in with the views urged

upon them by the client. These are the banes of expert testimony. When the testimony concerns a scientific or other technical issue, it may be unreasonable to expect a judge to resolve the issue without the aid of such testimony. But judges are experts on law, and there is an abundance of published materials, in the form of treatises, law review articles, statutes, and cases, all in English (if English is the foreign country's official language), to provide neutral illumination of issues of foreign law. I cannot fathom why in dealing with the meaning of laws of English-speaking countries that share our legal origins judges should prefer paid affidavits and testimony to published materials.

It is only a little less perverse for judges to rely on testimony to ascertain the law of a country whose official language is not English, at least if is a major country and has a modern legal system. Although most Americans are monolingual, including most judges, there are both official translations of French statutes into English, Legifrance, "Codes and Texts," http://195.83.177.9/code/index.phtml?lang=uk (visited Aug. 4, 2010), and abundant secondary material on French law, including French contract and procedural law, published in English. Barry Nicholas, *The French Law of Contract* (2d ed. 1992); Denis Tallon, "Contract Law," in *Introduction to French Law* 205 (George A. Bermann & Etienne Picard eds. 2008); Loïc Cadiet & Soraya Amrani-Mekki, "Civil Procedure," in *Introduction to French Law*, *supra*, at 307; Stefan Vogenauer, "Interpretation of Contracts: Concluding Comparative Observations," in *Contract Terms* 123 (Andrew Burrows & Edwin Peel eds. 2007); Daniel Soulez Larivière, "Overview

of the Problems of French Civil Procedure," 45 *Am. J. Comp. L.* 737, 743-44 (1997); James Beardsley, "Proof of Fact in French Civil Procedure," 34 *Am. J. Comp. L.* 459 (1986). Neither party cited *any* such material, except translations of statutory provisions; beyond that they relied on the affidavits of their expert witnesses.

Because English has become the international *lingua franca*, it is unsurprising that most Americans, even when otherwise educated, make little investment in acquiring even a reading knowledge of a foreign language. But our linguistic provincialism does not excuse intellectual provincialism. It does not justify our judges in relying on paid witnesses to spoon feed them foreign law that can be found well explained in English-language treatises and articles. I do not criticize the district judge in this case, because he was following the common practice. But it is a bad practice, followed like so many legal practices out of habit rather than reflection. It is excusable only when the foreign law is the law of a country with such an obscure or poorly developed legal system that there are no secondary materials to which the judge could turn. The French legal system is obviously not of that character. The district court could—as this court did in *Abad v. Bayer Corp.*, 563 F.3d 663, 670-71 (7th Cir. 2009), with respect to the law of Argentina—have based his interpretation of French contract law on published writings as distinct from paid testimony.

Of course often the most authoritative literature will be in the language of the foreign country. But often too there will be official, or reputable unofficial, translations

and when there are not the parties can have the relevant portions translated into English. Translations figure prominently in a variety of cases tried in American courts, such as drug-trafficking and immigration cases; why not in cases involving foreign law?

Article 1156 of the French Civil Code—the provision that the briefs principally discuss—states in its entirety: "*On doit dans les conventions rechercher quelle a été la commune intention des parties contractantes, plutôt que de s'arrêter au sens littéral des termes.*" In idiomatic English (the official English version is stilted), this means that in interpreting a contract one should search for what the parties' joint intention was, rather than stopping with the literal meaning of the contract's terms. The plaintiff argues that this means that no matter how clear the contract appears to be, a party is entitled to present evidence at trial that the parties intended something else. "French law," according to the plaintiff's opening brief, "clearly provides that an assessment of the parties' rights and obligations under the [contract] must be evaluated in light of the parties' mutual intent, regardless of whether the contract is deemed unambiguous."

What is true and worth noting is that the civil law—the law of Continental Europe, as distinct from Anglo-American law—of contracts places an emphasis on fault that is not found in the common law. As Holmes remarked, the common law conceives of contracts as options—when you sign a contract in which you promise a specified performance you buy an option to either perform as promised or pay damages, Oliver Wendell

Holmes, "The Path of the Law," 10 *Harv. L. Rev.* 457, 462 (1897), unless damages are not an adequate remedy in the particular case. Whether you were at fault in deciding not to perform—you could have done so but preferred to pay damages because someone offered you a higher price for the goods that you'd promised to the other party to your contract—is therefore irrelevant.

In the civil law, in contrast, a party is in breach of his contract and therefore subject to a legal sanction only if he "could reasonably have been expected to behave in a different way," that is, only if he was at fault in failing to perform. Jürgen Basedow, "Towards a Universal Doctrine of Breach of Contract: The Impact of the CISG," 25 *Int'l Rev. L. & Econ.* 487, 496 (2005) ("the fault principle is often considered to be an indispensable part of the law of obligations in civil law countries"); see also Nicholas, *supra*, at 200-01; Tallon, *supra*, at 224-25, 230-31; Richard Hyland, "*Pacta Sunt Servanda*: A Meditation," 34 *Va. J. Int'l L.* 405, 429-30 (1994); John Y. Gotanda, "Recovering Lost Profits in International Disputes," 36 *Georgetown J. Int'l L.* 61, 76-77 (2004). The civil law embraces the slogan *pacta sunt servanda*—promises are to be obeyed, not commuted to a price believed to approximate their value. That is why in the civil law the default remedy for breach of contract is (though more in principle than in practice) specific performance rather than damages. Nicholas, *supra*, at 211-12; Ronald J. Scalise, Jr., "Why No 'Efficient Breach' in the Civil Law?: A Comparative Assessment of the Doctrine of Efficient Breach of Contract," 55 *Am. J. Comp. L.* 721, 726-27 (2007); see Tallon, *supra*, at 233-34; John P. Dawson, "Specific Performance in France and

Germany," 57 *Mich. L. Rev.* 495, 524-25 (1959). You *should* have performed your promise, so the court will *order* you to do so.

The common law of contracts evolved from the law merchant, the civil law of contracts from canon law. Joseph M. Perillo, "UNIDROIT Principles of International Commercial Contracts: The Black Letter Text and a Review," 63 *Fordham L. Rev.* 281, 308 n. 190 (1994). Priests do not take promise breaking quite as lightly as businessmen, but on the other hand are not attuned to commercial usages, such as options. Yet despite the difference in origins, differences in outcome under the two legal regimes are small and shrinking. E.g., Stefan Grundmann, "The Fault Principle as the Chameleon of Contract Law: A Market Function Approach," 107 *Mich. L. Rev.* 1583, 1586-91 (2009); Vogenauer, *supra*, at 149-50; Wayne R. Barnes, "Contemplating a Civil Law Paradigm for a Future International Commercial Code," 65 *La. L. Rev.* 677, 751-52 (2005); Gotanda, *supra*, at 63-64; Patricia Pattison & Daniel Herron, "The Mountains Are High and the Emperor Is Far Away: Sanctity of Contract in China," 40 *Am. Bus. L.J.* 459, 475 (2003). A difference at least in tone remains, however, and enables one to see why French law might, as the plaintiff contends, be more concerned to determine the parties' intentions than American law would be. For if an intention is innocent—a party never intended the promise that he is now accused of having broken—ascribing fault to him, viewed as a precondition to finding him guilty of a breach of contract, is a graver step. Conversely, if the party did intend the promise but somehow it failed to get

written down intelligibly, he should not be permitted to break it by pointing to a writing. Hence the greater "readiness [of French courts] to have recourse to previous negotiations and subsequent conduct of the parties" in interpreting a contract, Vogenauer, *supra*, at 150—to conduct a deeper search into subjective understandings.

The civil-law culture is the basis for the plaintiff's claim to be entitled to a trial at which to present evidence that its contract with the defendant was intended to mean something different from what it says. This claim cannot be derived from Article 1156, which, as the majority opinion in this case points out, just tells the court to search for what the parties' joint intention was rather than stopping with the literal meaning of the contract's terms. That is no different from warnings in American contract law to be wary of literal interpretations of contracts because such interpretations often are mistaken. *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 860 (7th Cir. 2002); *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 6-7 (1st Cir. 2001); *Outlet Embroidery Co. v. Derwent Mills*, 172 N.E. 462, 463 (N.Y. 1930) (Cardozo, C.J.). It is based rather on the greater willingness (in principle—which will turn out to be an essential qualification) of a French court than of an American one to dig deeply for reassurance that it is not distorting the parties' intentions by blinding itself to everything that is not text.

The argument may seem to be supported by the fact that French law does not have a parol evidence rule applicable to commercial cases. See French Commercial

Code, Art. 110-3; CISG-AC [Advisory Council of the Convention of International Sale of Goods], Opinion No. 3, "Parol Evidence Rule, Plain Meaning Rule, Contractual Merger Clause and the CISG," ¶ 1.2.8 (Oct. 23, 2004), www.cisg.law.pace.edu/cisg/CISG-AC-op3.html (visited Aug. 6, 2010); Alberto Luis Zuppi, "The Parol Evidence Rule: A Comparative Study of the Common Law, the Civil Law Tradition, and *Lex Mercatoria*," 35 *Ga. J. Int'l & Comp. L.* 233, 258-60 (2007); Arthur T. von Mehren, "Civil-Law Analogues to Consideration: An Exercise in Comparative Analysis," 72 *Harv. L. Rev.* 1009, 1013 and n. 15 (1959). An approximation to that rule, and to the related "four corners" rule, *Bank v. Truck Ins. Exchange*, 51 F.3d 736, 737-38 (7th Cir. 1995); E. Allan Farnsworth, *Contracts* § 7.12, p. 464 (4th ed. 2004), which forbids using extrinsic evidence to contradict an unambiguous written contract, is found in Article 1341 of the French Civil Code for ordinary contracts unless very small. (Neither rule is limited to oral evidence, despite the word "parol," which is derived from the French word for "word"; the parol evidence rule merely excludes extrinsic evidence concerning precontractual negotiations if the written contract was intended to be the parties' complete agreement, *Utica Mutual Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 713-14 (7th Cir. 2004); see also *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 745-46 (7th Cir. 1988); Farnsworth, *supra*, § 7.2, pp. 414-16).) Article 1341 bars "proof by witnesses" that is inconsistent with the written contract unless there is a "commencement of proof in writing"—a writing originating with the defendant that makes it probable that an alleged fact about the parties' deal is true. Vogenauer,

*supra*, at 135-37; Jacques H. Herbots, "Interpretation of Contracts," in Jan M. Smits, *The Elgar Encyclopedia of Comparative Law* 325, 337 (2006).

But the limitations on extrinsic evidence in Article 1341 do not apply to commercial contracts, a possible characterization of the contract at issue in this case, though not an inevitable characterization for reasons explained in the majority opinion. Article 110-3 of the French Commercial Code provides that "with regard to traders, commercial instruments may be proven by any means unless the law specifies otherwise" (footnote omitted). And CISG-AC Opinion No. 3, *supra*, states that "though the French Civil Code . . . incorporates a version of the Parol Evidence Rule for ordinary contracts, all forms of proof are generally available against merchants." See also United Nations Convention on Contracts for the International Sale of Goods, art. 11, 52 Fed. Reg. 6262, 6265 (Mar. 2, 1987); Louis F. Del Duca, "Implementation of Contract Formation Statute of Frauds, Parol Evidence, and Battle of Forms CISG Provisions in Civil and Common Law Countries," 38 *UCC L.J.* 55, 56-57 and n. 3 (2005).

This gap in French commercial law has little practical significance, however, because it mainly reflects the fact that civil law systems do not use juries in civil cases. As a result, their rules on admissibility of evidence are notably looser than in common law jurisdictions. Frederick Schauer, "On the Supposed Jury-Dependence of Evidence Law," 155 *U. Pa. L. Rev.* 165, 174-75 (2006); Kenneth Williams, "Do We Really Need the Federal Rules of Evidence?," 74 *N. Dak. L. Rev.* 1, 21-22 (1998); Konstantinos D. Kerameus, "A Civilian Lawyer Looks

at Common Law Procedure," 47 *La. L. Rev.* 493, 499-503 (1987). Although technically the parol evidence and four-corners rules are rules of contract law rather of evidence, *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 546 (7th Cir. 2000); Farnsworth, *supra*, § 7.2, p. 416, they are strongly influenced by concern lest trial by jury upset the expectations of contracting parties as embodied in written contracts. *AM Int'l Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 576 (7th Cir. 1995); *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1373 (7th Cir. 1990); Charles T. McCormick, "The Parol Evidence Rule as a Procedural Device for Control of the Jury," 41 *Yale L.J.* 365 (1932).

Unburdened by juries and tight rules of evidence, French courts could range further afield than American courts in search of subjective contractual intentions. Could—but don't. As explained in Vogenauer, *supra*, at 135-36, while "as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation . . . this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to 'add to, vary or contradict a deed or other written instrument.' On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially 'right' outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, *they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors.* . . . Extrinsic evidence can, however, be used for the purposes of interpreting a written document that

contains internal contradictions or is otherwise unclear" (emphasis added, footnote omitted)—which is also true of American law, but irrelevant to this case.

Unlike American courts, moreover, "French commercial courts are staffed by members of the business community, who serve part-time as judges. There is no requirement that they have legal training. Hearings before French commercial courts typically last less than an hour. Witnesses are virtually never heard by the court. In any case, a French rule of evidence makes evidence originating from any of the parties inadmissible, which means that no employee of any of the two companies may validly testify." Gilles Cuniberti, "Beyond Contract—The Case for Default Arbitration in International Commercial Disputes," 32 *Fordham Int'l L.J.* 417, 431-32 (2009) (footnote omitted). "The past continues to shape the present. This is especially true with respect to one particularity of the French judicial system which is rarely evoked—the absence of a jury in civil court proceedings, and the consequences this has on procedure, which remains 98% written, with no witnesses, no investigations ordered by the judge, and no cross-examination. The hearing is a sort of ritual, a rigid, immutable show in which the silent judge, flanked—for the moment at least— by two colleagues, listens to the 'pleadings': an exercise in solitary eloquence, a lengthy monologue by a lawyer who blindly and desperately attempts to breathe life into documents, or even affidavits, which are inert, consigned to paper, embedded in ritual phraseology, and accompanied by a document proving identity. It is the absence of any jury which has dictated the entire concept

of what a civil court hearing should be." Larivière, *supra*, at 743-44. "[T]he tendency [in French civil litigation is] to prefer written proof of ultimate fact—evidence that can be analyzed on the basis of a writing even though its origins may be in oral testimony or other more difficult-to-appreciate forms of proof." Beardsley, *supra*, at 470.

The plaintiff in our case wants to marry French substantive doctrine that might appear to permit a more far-ranging evidentiary exploration in a contract case to American trial procedure, which permits a far-ranging evidentiary exploration in many types of case but not in cases charging a breach of a clear written contract. The marriage has produced an ungainly hybrid that corresponds neither to French law nor to American law. It is true that some foreign legal systems heavily influenced by the civil codes do use common law procedure—as does Louisiana. Stephen Goldstein, "The Odd Couple: Common Law Procedure and Civilian Substantive Law," 78 *Tul. L. Rev.* 291 (2003). These typically are former code jurisdictions that were conquered, or in the case of Louisiana bought, by a common law nation such as Britain or the United States. But they do not do it on an ad hoc basis, as proposed by our plaintiff; and, so far as I can discover, they do not, by doing so, deny contracting parties the protection of a clearly written contract.

It is at least as difficult to persuade a French court (because of its composition and usages) to admit extrinsic evidence in a contract case as it is to persuade an American court to do so. See Cuniberti, *supra*, at 431-32; Larivière, *supra*, at 743-44; Beardsley, *supra*, at 469-70.

The happenstance that this case has been brought in an American court must not be allowed to produce a misfit between substantive and procedural law.

Curiously, one of the defendant's experts, Professor Caron, not only cites Article 1156 but asserts that in interpreting the "common intention of the parties . . . reference to the negotiations that may have taken place between the parties should be required." I don't think he means that there *is* a legal requirement; there isn't. I think he means it would be helpful to refer to the previous negotiations in this case because they support the defendant's position. Yet in its brief the defendant goes further and says that "Article 1156 simply *requires* that a court look beyond the literal meaning of the terms of an agreement, even where—as here—the terms of the agreement are plain and unambiguous" (emphasis added). This is not a correct interpretation of French law, or even one helpful to the defendant, since the contract unambiguously supports its position. The defendant acknowledges, on the basis of what appears to be its expert's misunderstanding or misstatement of French law, that it is not enough that the contract be unambiguous; the evidence of subjective intention must also be. Among other things this ignores the following exception, which is not inapplicable to commercial contracts, to the principle that "judicial interpretation of contracts is considered to entail questions of fact and therefore be subject to the discretion of the lower courts": in "cases in which there has been a distortion (*une dénaturation*) of the clear and precise terms of the contract . . ., the court is deemed to be faced not merely with a question of the

interpretation of a contract, but rather a refusal to apply it." Tallon, *supra*, at 225; see also Herbots, *supra*, at 334. It must not refuse to apply it.

The parties' reliance on affidavits to establish the standard for interpreting their contract has produced only confusion. They should have relied on published analyses of French commercial law.

WOOD, *Circuit Judge*, concurring.   While I endorse without reservation the majority's reading of the 1991 contract that is at the heart of this case, I write separately to note my disagreement with the discussion of FED. R. CIV. P. 44.1 in both the majority opinion, *ante* at 6-7, and in Judge Posner's concurring opinion. Rule 44.1 itself establishes no hierarchy for sources of foreign law, and I am unpersuaded by my colleagues' assertion that expert testimony is categorically inferior to published, English-language materials. Exercises in comparative law are notoriously difficult, because the U.S. reader is likely to miss nuances in the foreign law, to fail to appreciate the way in which one branch of the other country's law interacts with another, or to assume erroneously that the foreign law mirrors U.S. law when it does not. As the French might put it more generally, ap-

parently similar phrases might be *faux amis.* A simple example illustrates why two words might be "false friends." A speaker of American English will be familiar with the word "actual," which is defined in Webster's Third New International Dictionary as "existing in act, . . . existing in fact or reality: really acted or acting or carried out—contrasted with *ideal* and *hypothetical* . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 22 (1993). So, one might say, "This is the actual chair used by George Washington." But the word "actuel" in French means "present" or right now. LE ROBERT & COLLINS COMPACT PLUS DICTIONNAIRE 7 (5th ed. 2003). A French person would thus use the term "les événements actuels" or "actualité" to refer to current events, not to describe something that really happened either now or in the past.

There will be many times when testimony from an acknowledged expert in foreign law will be helpful, or even necessary, to ensure that the U.S. judge is not confronted with a "false friend" or that the U.S. judge understands the full context of the foreign provision. Some published articles or treatises, written particularly for a U.S. audience, might perform the same service, but many will not, even if they are written in English, and especially if they are translated into English from another language. It will often be most efficient and useful for the judge to have before her an expert who can provide the needed precision on the spot, rather than have the judge wade through a number of secondary sources. In practice, the experts produced by the parties are often the authors of the leading treatises and scholarly articles in the foreign country anyway. In those

cases, it is hard to see why the person's views cannot be tested in court, to guard against the possibility that he or she is just a mouthpiece for one party. Prominent lawyers from the country in question also sometimes serve as experts. That too is perfectly acceptable in principle, especially if the question requires an understanding of court procedure in the foreign country. In many places, the academic branch of the legal profession is entirely separate from the bar. Academic writings in such places tend to be highly theoretical and removed from the day-to-day realities of the practice of law.

To be clear, I have no objection to the use of written sources of foreign law. Rule 44.1 permits the court to consider "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." The written sources cited by both of my colleagues throw useful light on the problem before us in this case, and both were well within their rights to conduct independent research and to rely on those sources. There is no need, however, to disparage oral testimony from experts in the foreign law. That kind of testimony has been used by responsible lawyers for years, and there will be many instances in which it is adequate by itself or it provides a helpful gloss on the literature. The tried and true methods set forth in FED. R. EVID. 702 for testing the depth of the witness's expertise, the facts and other relevant information on which the witness has relied, and the quality of the witness's application of those principles to the problem at hand, suffice to protect the court against self-serving experts in foreign law, just as

they suffice to protect the process for any other kind of expert.

Finally, my colleagues see no material difference between a judge's ability to research the laws of Louisiana or Puerto Rico and her ability to research the laws of France, Australia, or Indonesia. With respect, I cannot agree with them. Like the laws of the other 49 states, the law of Louisiana is based on many sources. One important such source is the Code Napoléon, but it is not the only source. Louisiana has legislation on the usual topics, it is part of the federal system, and its courts function much like the courts of other states. See, *e.g.*, Kensie Kim, *Mixed Systems in Legal Origins Analysis*, 83 S. CAL. L. REV. 693, 720 n.123 (2010) (noting that, though its civil procedure is in the civil law form, Louisiana's criminal procedure has adopted a U.S. common-law form); William R. Forrester, Jr., *New Technology & The 2007 Amendments to the Code of Civil Procedure*, 55 LA. BAR J. 236 (2008) (noting that the 2007 amendments to Louisiana's civil procedure rules adopt most of the provisions in the Federal Rules of Civil Procedure for electronically stored information); Harry J. Haynsworth, *The Unified Business Organizations Code*, 29 DEL. J. CORP. L. 83, 101 n.110 (2004) (noting that Louisiana has adopted several provisions of the Uniform Commercial Code); William R. Forrester, Jr., *Recent Changes to the Code of Civil Procedure*, 51 LA. BAR J. 342 (2004) (discussing amendments to Louisiana's civil procedure rules governing expert discovery); David W. Robertson, *Summary Judgment and Burden of Proof*, 45 LA. BAR J. 331 (1997) (discussing the new Louisiana rule on summary judgment and noting

that it was derived directly from the U.S. Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Puerto Rico's system is somewhat less accessible for non-Spanish-speaking Americans. Interestingly, one finds Puerto Rican materials under the "International/World-wide Materials" database in Westlaw®, not under the U.S. States database. This is so even though Congress has expressly defined Puerto Rico as a "state" for purposes of the diversity jurisdiction statute. See 28 U.S.C. § 1332(e) (2010). There is no denying the fact, however, that Puerto Rico is far more integrated into the U.S. legal system than any foreign country is. Since Puerto Rico falls within the jurisdiction of the First Circuit, see 28 U.S.C. § 41 (2010), the judges of that court regularly hear cases implicating Puerto Rican law. Furthermore, American law has greatly influenced the Puerto Rican legal system. See, *e.g.*, Harry J. Haynsworth, *The Unified Business Organizations Code*, 29 DEL. J. CORP. L. 83, 86 n.32, 87 (2004) (stating that Puerto Rico has adopted the Delaware General Corporation Law and the Revised Uniform Partnership Act); Symeon C. Symeonides, *Choice of Law in the American Courts in 1998: Twelfth Annual Survey*, 47 AM. J. COMP. L. 327, 354 (1999) (noting that Puerto Rican choice-of-law jurisprudence was influenced by the Second Restatement); Luis E. Rodríguez-Rivera, *Genesis of Puerto Rico's Environmental Law*, 67 REVISTA JURIDICA UNIVERSIDAD DE PUERTO RICO 201, 209-11 (1998) (discussing the impact of the American legal tradition on Puerto Rican law, especially environmental law). As a practical matter, therefore, the Supreme Court was on firm ground when it assumed, in the text of Rule 44.1,

that only the law of a "foreign country" would be subject to the rule's procedures, not the law of a U.S. state, territory, or commonwealth.

For these reasons, although I join the majority's reasoning in all other respects, I do not share their views about the use of expert testimony to prove foreign law. I therefore concur in the judgment to that extent.